[No. S023721. May 20, 1993.]

ANNA JOHNSON, Plaintiff and Appellant, v.
MARK CALVERT et al., Defendants and Respondents.

**COUNSEL**

Richard C. Gilbert and Diane J. Marlowe for Plaintiff and Appellant.

Van Deusen, Youmans & Walmsley, Christian R. Van Deusen and Robert R. Walmsley for Defendants and Respondents.

Harold LaFlamme, Michelle Ben-Hur, John L. Dodd and Karen J. Dodd for Minor.

Jon Davidson, Paul L. Hoffman, Carol A. Sobel, Rogers & Wells, Rebecca C. Klipfel and Suzanne M. Madison as Amici Curiae.

## OPINION

**PANELLI, J.**—In this case we address several of the legal questions raised by recent advances in reproductive technology. When, pursuant to a surrogacy agreement, a zygote[1] formed of the gametes[2] of a husband and wife is implanted in the uterus of another woman, who carries the resulting fetus to term and gives birth to a child not genetically related to her, who is the child's "natural mother" under California law? Does a determination that the wife is the child's natural mother work a deprivation of the gestating woman's constitutional rights? And is such an agreement barred by any public policy of this state?

We conclude that the husband and wife are the child's natural parents, and that this result does not offend the state or federal Constitution or public policy.

### FACTS[3]

Mark and Crispina Calvert are a married couple who desired to have a child. Crispina was forced to undergo a hysterectomy in 1984. Her ovaries remained capable of producing eggs, however, and the couple eventually considered surrogacy. In 1989 Anna Johnson heard about Crispina's plight from a coworker and offered to serve as a surrogate for the Calverts.

On January 15, 1990, Mark, Crispina, and Anna signed a contract providing that an embryo created by the sperm of Mark and the egg of Crispina would be implanted in Anna and the child born would be taken into Mark and Crispina's home "as their child." Anna agreed she would relinquish "all parental rights" to the child in favor of Mark and Crispina. In return, Mark and Crispina would pay Anna $10,000 in a series of installments, the last to be paid six weeks after the child's birth. Mark and Crispina were also to pay for a $200,000 life insurance policy on Anna's life.[4]

The zygote was implanted on January 19, 1990. Less than a month later, an ultrasound test confirmed Anna was pregnant.

Unfortunately, relations deteriorated between the two sides. Mark learned that Anna had not disclosed she had suffered several stillbirths and miscarriages. Anna felt Mark and Crispina did not do enough to obtain the required

---

[1]An organism produced by the union of two gametes. (McGraw-Hill Dict. of Scientific and Technical Terms (4th ed. 1989) p. 783.)

[2]A cell that participates in fertilization and development of a new organism, also known as a germ cell or sex cell. (McGraw-Hill Dict. of Scientific and Technical Terms, *supra*, p. 2087.)

[3]The statement of facts and the discussion of the legislative history of the Uniform Parentage Act, *post*, pages 88-89, are adapted from the opinion of the Court of Appeal.

[4]At the time of the agreement, Anna already had a daughter, Erica, born in 1987.

insurance policy. She also felt abandoned during an onset of premature labor in June.

In July 1990, Anna sent Mark and Crispina a letter demanding the balance of the payments due her or else she would refuse to give up the child. The following month, Mark and Crispina responded with a lawsuit, seeking a declaration they were the legal parents of the unborn child. Anna filed her own action to be declared the mother of the child, and the two cases were eventually consolidated. The parties agreed to an independent guardian ad litem for the purposes of the suit.

The child was born on September 19, 1990, and blood samples were obtained from both Anna and the child for analysis. The blood test results excluded Anna as the genetic mother. The parties agreed to a court order providing that the child would remain with Mark and Crispina on a temporary basis with visits by Anna.

At trial in October 1990, the parties stipulated that Mark and Crispina were the child's genetic parents. After hearing evidence and arguments, the trial court ruled that Mark and Crispina were the child's "genetic, biological and natural" father and mother, that Anna had no "parental" rights to the child, and that the surrogacy contract was legal and enforceable against Anna's claims. The court also terminated the order allowing visitation. Anna appealed from the trial court's judgment. The Court of Appeal for the Fourth District, Division Three, affirmed. We granted review.

## DISCUSSION

### *Determining Maternity Under the Uniform Parentage Act*

The Uniform Parentage Act (the Act) was part of a package of legislation introduced in 1975 as Senate Bill No. 347. The legislation's purpose was to eliminate the legal distinction between legitimate and illegitimate children. The Act followed in the wake of certain United States Supreme Court decisions mandating equal treatment of legitimate and illegitimate children. (See, e.g., *Levy* v. *Louisiana* (1968) 391 U.S. 68 [20 L.Ed.2d 436, 88 S.Ct. 1509] [state could not deny illegitimate child right to bring tort action for wrongful death of parent if it gave legitimate child the same right]; *Glona* v. *American Guarantee Co.* (1968) 391 U.S. 73 [20 L.Ed.2d 441, 88 S.Ct. 1515] [state could not deny parent of illegitimate child right to bring tort action for wrongful death of child if it gave parent of legitimate child the same right].) A press release issued on October 2, 1975, described Senate Bill No. 347 this way: "The bill, as amended, would revise or repeal various laws which

now provide for labeling children as legitimate or illegitimate and defining their legal rights and those of their parents accordingly. In place of these cruel and outmoded provisions, SB 347 would enact the Uniform Parentage Act which bases parent and child rights on the existence of a parent and child relationship rather than on the marital status of the parents."

The pertinent portion of Senate Bill No. 347, which passed with negligible opposition, became part 7 of division 4 of the California Civil Code, sections 7000-7021.[5]

Civil Code sections 7001 and 7002 replace the distinction between legitimate and illegitimate children with the concept of the "parent and child relationship." The "parent and child relationship" means "the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties, and obligations. It includes the mother and child relationship and the father and child relationship." (Civ. Code, § 7001.) "The parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents." (Civ. Code, § 7002.) The "parent and child relationship" is thus a legal relationship encompassing two kinds of parents, "natural" and "adoptive."

Passage of the Act clearly was not motivated by the need to resolve surrogacy disputes, which were virtually unknown in 1975. Yet it facially applies to *any* parentage determination, including the rare case in which a child's maternity is in issue. We are invited to disregard the Act and decide this case according to other criteria, including constitutional precepts and our sense of the demands of public policy. We feel constrained, however, to decline the invitation. Not uncommonly, courts must construe statutes in factual settings not contemplated by the enacting legislature. For example, in *People* v. *Salemme* (1992) 2 Cal.App.4th 775 [3 Cal.Rptr.2d 398], the court upheld a conviction of burglary when the felony the defendant entered the residence to commit was that of the fraudulent sale of securities. This scenario likely was not within the Legislature's contemplation when it enacted Penal Code section 459. Nonetheless, the burglary statute, on its face, addressed the defendant's conduct and was properly interpreted to apply to it. Similarly, the Act offers a mechanism to resolve this dispute, albeit one not specifically tooled for it. We therefore proceed to analyze the parties' contentions within the Act's framework.

■ These contentions are readily summarized. Anna, of course, predicates her claim of maternity on the fact that she gave birth to the child. The

---

[5]Effective January 1, 1994, Civil Code sections 7000-7021 have been repealed and replaced with equivalent provisions in the Family Code. (Stats. 1992, ch. 162, § 4; see Fam. Code, §§ 7600-7650 [eff. Jan. 1, 1994].)

Calverts contend that Crispina's genetic relationship to the child establishes that she is his mother. Counsel for the minor joins in that contention and argues, in addition, that several of the presumptions created by the Act dictate the same result. As will appear, we conclude that presentation of blood test evidence is one means of establishing maternity, as is proof of having given birth, but that the presumptions cited by minor's counsel do not apply to this case.

We turn to those few provisions of the Act directly addressing the determination of maternity. "Any interested party," presumably including a genetic mother, "may bring an action to determine the existence . . . of a mother and child relationship." (Civ. Code, § 7015.) Civil Code section 7003 provides, in relevant part, that between a child and the natural mother a parent and child relationship "*may* be established by proof of her having given birth to the child, or under [the Act]." (Civ. Code, § 7003, subd. (1), italics added.) Apart from Civil Code section 7003, the Act sets forth no specific means by which a natural mother can establish a parent and child relationship. However, it declares that, insofar as practicable, provisions applicable to the father and child relationship apply in an action to determine the existence or nonexistence of a mother and child relationship. (Civ. Code, § 7015.) Thus, it is appropriate to examine those provisions as well.

A man can establish a father and child relationship by the means set forth in Civil Code section 7004. (Civ. Code, §§ 7006, 7004.) Paternity is presumed under that section if the man meets the conditions set forth in section 621 of the Evidence Code. (Civ. Code, § 7004, subd. (a).) The latter statute applies, by its terms, when determining the questioned paternity of a child born to a married woman, and contemplates reliance on evidence derived from blood testing. (Evid. Code, § 621, subds. (a), (b);[6] see Evid. Code, §§ 890-897 [Uniform Act on Blood Tests to Determine Paternity].) Alternatively, Civil Code section 7004 creates a presumption of paternity based on the man's conduct toward the child (e.g., receiving the child into his home

---

[6]Evidence Code section 621 provides in relevant part as follows: "(a) Except as provided in subdivision (b), the issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage. [¶] (b) Notwithstanding subdivision (a), if the court finds that the conclusions of all the experts, as disclosed by the evidence based upon blood tests performed pursuant to Chapter 2 (commencing with Section 890) of Division 7, are that the husband is not the father of the child, the question of paternity of the husband shall be resolved accordingly." Effective January 1, 1994, Evidence Code sections 621 and 890 through 897 have been repealed and replaced with equivalent provisions of the Family Code. (Stats. 1992, ch. 162, §§ 8, 9; see Fam. Code, §§ 7500-7501, 7550-7557 [eff. Jan. 1, 1994].)

and openly holding the child out as his natural child) or his marriage or attempted marriage to the child's natural mother under specified conditions.[7]

In our view, the presumptions contained in Civil Code section 7004 do not apply here. They describe situations in which substantial evidence points to a particular man as the natural father of the child. (9B West's U.Laws Ann. (1987) Unif. Parentage Act, com. foll. § 4, p. 299.) In this case, there is no question as to who is claiming the mother and child relationship, and the factual basis of each woman's claim is obvious. Thus, there is no need to resort to an evidentiary presumption to ascertain the identity of the natural mother. Instead, we must make the purely legal determination as between the two claimants.

Significantly for this case, Evidence Code section 892 provides that blood testing may be ordered in an action when paternity is a relevant fact. When maternity is disputed, genetic evidence derived from blood testing is likewise admissible. (Evid. Code, § 892; see Civ. Code, § 7015.) The Evidence Code further provides that if the court finds the conclusions of all the experts, as disclosed by the evidence based on the

---

[7]Civil Code section 7004 provides as follows: "(a) A man is presumed to be the natural father of a child if he meets the conditions as set forth in Section 621 of the Evidence Code or in any of the following paragraphs: [¶] (1) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a decree of separation is entered by a court. [¶] (2) Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following are true: [¶] (i) If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce. [¶] (ii) If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation. [¶] (3) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true: [¶] (i) With his consent, he is named as the child's father on the child's birth certificate. [¶] (ii) He is obligated to support the child under a written voluntary promise or by court order. [¶] (4) He receives the child into his home and openly holds out the child as his natural child. [¶] (5) If the child was born and resides in a nation with which the United States engages in an Orderly Departure Program or successor program, he acknowledges that he is the child's father in a declaration under penalty of perjury, as specified in Section 2015.5 of the Code of Civil Procedure. [¶] This paragraph shall remain in effect only until January 1, 1997, and on that date shall become inoperative. [¶] . . . [¶] (c) Except as provided in Section 621 and 621.1 of the Evidence Code, a presumption under this section is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence. If two or more presumptions arise under this section which conflict with each other, the presumption which, on the facts, is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing paternity of the child by another man."

blood tests, are that the alleged father is not the father of the child, the question of paternity is resolved accordingly. (Evid. Code, § 895.) By parity of reasoning, blood testing may also be dispositive of the question of maternity. Further, there is a rebuttable presumption of paternity (hence, maternity as well) on the finding of a certain number of genetic markers. (Evid. Code, § 895.5.)

■ Disregarding the presumptions of paternity that have no application to this case, then, we are left with the undisputed evidence that Anna, not Crispina, gave birth to the child and that Crispina, not Anna, is genetically related to him. Both women thus have adduced evidence of a mother and child relationship as contemplated by the Act. (Civ. Code, §§ 7003, subd. (1), 7004, subd. (a), 7015; Evid. Code, §§ 621, 892.) Yet for any child California law recognizes only one natural mother, despite advances in reproductive technology rendering a different outcome biologically possible.[8]

■ We see no clear legislative preference in Civil Code section 7003 as between blood testing evidence and proof of having given birth.[9] "May" indicates that proof of having given birth is a permitted method of establishing a mother and child relationship, although perhaps not the exclusive one. The disjunctive "or" indicates that blood test evidence, as prescribed in the Act, constitutes an alternative to proof of having given birth. It may be that the language of the Act merely reflects "the ancient dictum *mater est quam [gestatio] demonstrat* (by gestation the mother is demonstrated). This phrase, by its use of the word 'demonstrated,' has always reflected an ambiguity in the meaning of the presumption. It is arguable that, while gestation may demonstrate maternal status, it is not the sine qua non of motherhood. Rather, it is possible that the common law viewed genetic consanguinity as the basis for maternal rights. Under this latter interpretation, gestation

[8]We decline to accept the contention of amicus curiae the American Civil Liberties Union (ACLU) that we should find the child has two mothers. Even though rising divorce rates have made multiple parent arrangements common in our society, we see no compelling reason to recognize such a situation here. The Calverts are the genetic and intending parents of their son and have provided him, by all accounts, with a stable, intact, and nurturing home. To recognize parental rights in a third party with whom the Calvert family has had little contact since shortly after the child's birth would diminish Crispina's role as mother.

[9]The Court of Appeal interpreted Civil Code section 7003, subdivision (1), to mean that only a "natural" mother can establish a mother and child relationship by proof of having given birth, and that a woman must first demonstrate, through blood test evidence, that she is the "natural" mother of the child before her evidence of having given birth can establish that she is the child's natural mother. We disagree with the Court of Appeal's reading of the statute. In our view, the term "natural" as used in subdivision (1) of Civil Code section 7003 simply refers to a mother who is not an adoptive mother. Section 7003 does not purport to answer the question before us, i.e., who is to be deemed the natural mother when the biological functions essential to bringing a child into the world have been allocated between two women.

simply would be irrefutable evidence of the more fundamental genetic relationship." (Hill, *What Does It Mean to Be a "Parent"? The Claims of Biology as the Basis for Parental Rights* (1991) 66 N.Y.U. L.Rev. 353, 370, fns. omitted.) This ambiguity, highlighted by the problems arising from the use of artificial reproductive techniques, is nowhere explicitly resolved in the Act.

 Because two women each have presented acceptable proof of maternity, we do not believe this case can be decided without enquiring into the parties' intentions as manifested in the surrogacy agreement. Mark and Crispina are a couple who desired to have a child of their own genes but are physically unable to do so without the help of reproductive technology. They affirmatively intended the birth of the child, and took the steps necessary to effect in vitro fertilization. But for their acted-on intention, the child would not exist. Anna agreed to facilitate the procreation of Mark's and Crispina's child. The parties' aim was to bring Mark's and Crispina's child into the world, not for Mark and Crispina to donate a zygote to Anna. Crispina from the outset intended to be the child's mother. Although the gestative function Anna performed was necessary to bring about the child's birth, it is safe to say that Anna would not have been given the opportunity to gestate or deliver the child had she, prior to implantation of the zygote, manifested her own intent to be the child's mother. No reason appears why Anna's later change of heart should vitiate the determination that Crispina is the child's natural mother.

We conclude that although the Act recognizes both genetic consanguinity and giving birth as means of establishing a mother and child relationship, when the two means do not coincide in one woman, she who intended to procreate the child—that is, she who intended to bring about the birth of a child that she intended to raise as her own—is the natural mother under California law.[10]

Our conclusion finds support in the writings of several legal commentators. (See Hill, *What Does It Mean to Be a "Parent"? The Claims of Biology*

---

[10]Thus, under our analysis, in a true "egg donation" situation, where a woman gestates and gives birth to a child formed from the egg of another woman with the intent to raise the child as her own, the birth mother is the natural mother under California law.

The dissent would decide *parentage* based on the best interests of the child. Such an approach raises the repugnant specter of governmental interference in matters implicating our most fundamental notions of privacy, and confuses concepts of parentage and custody. Logically, the determination of parentage must precede, and should not be dictated by, eventual custody decisions. The implicit assumption of the dissent is that a recognition of the genetic intending mother as the natural mother may sometimes harm the child. This assumption overlooks California's dependency laws, which are designed to protect *all* children irrespective of the manner of birth or conception. Moreover, the best interests standard poorly serves the child in the present situation: it fosters instability during litigation and, if applied to recognize the gestator as the natural mother, results in a split of custody between the natural

*as the Basis for Parental Rights, supra,* 66 N.Y.U. L.Rev. 353; Shultz, *Reproductive Technology and Intent-Based Parenthood: An Opportunity for Gender Neutrality* (1990) Wis. L.Rev. 297 [Shultz]; Note, *Redefining Mother: A Legal Matrix for New Reproductive Technologies* (1986) 96 Yale L.J. 187, 197-202 [Note].) Professor Hill, arguing that the genetic relationship per se should not be accorded priority in the determination of the parent-child relationship in the surrogacy context, notes that "while all of the players in the procreative arrangement are necessary in bringing a child into the world, *the child would not have been born but for the efforts of the intended parents.* . . . [¶] . . . [T]he intended parents are the first cause, or the prime movers, of the procreative relationship." (Hill, *op. cit. supra,* at p. 415, italics in original.)

Similarly, Professor Shultz observes that recent developments in the field of reproductive technology "dramatically extend affirmative intentionality. . . . Steps can be taken to bring into being a child who would not otherwise have existed." (Shultz, *op. cit. supra,* p. 309.) "Within the context of artificial reproductive techniques," Professor Shultz argues, "intentions that are voluntarily chosen, deliberate, express and bargained-for ought presumptively to determine legal parenthood." (*Id.,* at p. 323, fn. omitted.)

Another commentator has cogently suggested, in connection with reproductive technology, that "[t]he mental concept of the child is a controlling factor of its creation, and the originators of that concept merit full credit as conceivers. The mental concept must be recognized as independently valuable; it creates expectations in the initiating parents of a child, and it creates expectations in society for adequate performance on the part of the initiators as parents of the child." (Note, *op. cit. supra,* 96 Yale L.J. at p. 196.)

Moreover, as Professor Shultz recognizes, the interests of children, particularly at the outset of their lives, are "[un]likely to run contrary to those of adults who choose to bring them into being." (Shultz, *op. cit. supra,* at p. 397.) Thus, "[h]onoring the plans and expectations of adults who will be responsible for a child's welfare is likely to correlate significantly with positive outcomes for parents and children alike." (*Ibid.*) Under Anna's interpretation of the Act, by contrast, a woman who agreed to gestate a fetus genetically related to the intending parents would, contrary to her expectations, be held to be the child's natural mother, with all the responsibilities that ruling would entail, if the intending mother declined to accept the child after its birth. In what we must hope will be the extremely rare situation in

father and the gestator, an outcome not likely to benefit the child. Further, it may be argued that, by voluntarily contracting away any rights to the child, the gestator has, in effect, conceded the best interests of the child are not with her.

which neither the gestator nor the woman who provided the ovum for fertilization is willing to assume custody of the child after birth, a rule recognizing the intending parents as the child's legal, natural parents should best promote certainty and stability for the child.

█ In deciding the issue of maternity under the Act we have felt free to take into account the parties' intentions, as expressed in the surrogacy contract, because in our view the agreement is not, on its face, inconsistent with public policy.

Preliminarily, Mark and Crispina urge us to interpret the Legislature's 1992 passage of a bill that would have regulated surrogacy as an expression of this state's public policy despite the fact that Governor Wilson's veto prevented the bill from becoming law. Senate Bill No. 937 contained a finding that surrogate contracts are not against sound public and social policy. (Sen. Bill No. 937 (1991-1992 Reg. Sess.).) Had Senate Bill No. 937 become law, there would be no room for argument to the contrary. The veto, however, raises a question whether the legislative declaration truly expresses California's public policy.

In the Governor's veto message we find, not unequivocal agreement with the Legislature's public policy assessment, but rather reservations about the practice of surrogate parenting. "Surrogacy is a relatively recent phenomenon. The full moral and psychological dimensions of this practice are not yet clear. In fact, they are just beginning to emerge. Only two published court opinions in California have treated this nettlesome subject. . . . Comprehensive regulation of this difficult moral issue is premature . . . . [¶] To the extent surrogacy continues to be practical, it can be governed by the legal framework already established in the family law area." (Governor's veto message to Sen. on Sen. Bill No. 937 (Sept. 26, 1992) Sen. Daily File (1991-1992 Reg. Sess.) p. 68.) Given this less than ringing endorsement of surrogate parenting, we conclude that the passage of Senate Bill No. 937, in and of itself, does not establish that surrogacy contracts are consistent with public policy. (Of course, neither do we draw the opposite conclusion from the fact of the Governor's veto.)

Anna urges that surrogacy contracts violate several social policies. Relying on her contention that she is the child's legal, natural mother, she cites the public policy embodied in Penal Code section 273, prohibiting the payment for consent to adoption of a child.[11] She argues further that the policies underlying the adoption laws of this state are violated by the

[11]Penal Code section 273 provides, in pertinent part, as follows: "(a) It is a misdemeanor for any person or agency to offer to pay money or anything of value, or to pay money or

surrogacy contract because it in effect constitutes a prebirth waiver of her parental rights.

We disagree. Gestational surrogacy differs in crucial respects from adoption and so is not subject to the adoption statutes. The parties voluntarily agreed to participate in in vitro fertilization and related medical procedures before the child was conceived; at the time when Anna entered into the contract, therefore, she was not vulnerable to financial inducements to part with her own expected offspring. As discussed above, Anna was not the genetic mother of the child. The payments to Anna under the contract were meant to compensate her for her services in gestating the fetus and undergoing labor, rather than for giving up "parental" rights to the child. Payments were due both during the pregnancy and after the child's birth. We are, accordingly, unpersuaded that the contract used in this case violates the public policies embodied in Penal Code section 273 and the adoption statutes. For the same reasons, we conclude these contracts do not implicate the policies underlying the statutes governing termination of parental rights. (See Welf. & Inst. Code, § 202.)

It has been suggested that gestational surrogacy may run afoul of prohibitions on involuntary servitude. (See U.S. Const., Amend. XIII; Cal. Const., art. I, § 6; Pen. Code, § 181.) Involuntary servitude has been recognized in cases of criminal punishment for refusal to work. (*Pollock* v. *Williams* (1944) 322 U.S. 4, 18 [88 L.Ed. 1095, 1104, 64 S.Ct. 792, 799]; see, generally, 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, §§ 411-414, pp. 591-596.) We see no potential for that evil in the contract at issue here, and extrinsic evidence of coercion or duress is utterly lacking. We note that although at one point the contract purports to give Mark and Crispina the sole right to determine whether to abort the pregnancy, at another point it acknowledges: "All parties understand that a pregnant woman has the

anything of value, to a parent for the placement for adoption, for the consent to an adoption, or for cooperation in the completion of an adoption of his or her child. [¶] (b) This section does not make it unlawful to pay the maternity-connected medical or hospital and necessary living expenses of the mother preceding and during confinement as an act of charity, as long as the payment is not contingent upon placement of the child for adoption, consent to the adoption, or cooperation in the completion of the adoption."

See also Penal Code section 181, which provides: "Every person who holds, or attempts to hold, any person in involuntary servitude, or assumes, or attempts to assume, rights of ownership over any person, or who sells, or attempts to sell, any person to another, or receives money or anything of value, in consideration of placing any person in the custody, or under the power or control of another, or who buys, or attempts to buy, any person, or pays money, or delivers anything of value, to another, in consideration of having any person placed in his custody, or under his power or control, or who knowingly aids or assists in any manner any one thus offending, is punishable by imprisonment in the state prison for two, three, or four years."

absolute right to abort or not abort any fetus she is carrying. Any promise to the contrary is unenforceable." We therefore need not determine the validity of a surrogacy contract purporting to deprive the gestator of her freedom to terminate the pregnancy.

Finally, Anna and some commentators have expressed concern that surrogacy contracts tend to exploit or dehumanize women, especially women of lower economic status. Anna's objections center around the psychological harm she asserts may result from the gestator's relinquishing the child to whom she has given birth. Some have also cautioned that the practice of surrogacy may encourage society to view children as commodities, subject to trade at their parents' will.

We are all too aware that the proper forum for resolution of this issue is the Legislature, where empirical data, largely lacking from this record, can be studied and rules of general applicability developed. However, in light of our responsibility to decide this case, we have considered as best we can its possible consequences.

We are unpersuaded that gestational surrogacy arrangements are so likely to cause the untoward results Anna cites as to demand their invalidation on public policy grounds. Although common sense suggests that women of lesser means serve as surrogate mothers more often than do wealthy women, there has been no proof that surrogacy contracts exploit poor women to any greater degree than economic necessity in general exploits them by inducing them to accept lower-paid or otherwise undesirable employment. We are likewise unpersuaded by the claim that surrogacy will foster the attitude that children are mere commodities; no evidence is offered to support it. The limited data available seem to reflect an absence of significant adverse effects of surrogacy on all participants.[12]

The argument that a woman cannot knowingly and intelligently agree to gestate and deliver a baby for intending parents carries overtones of the reasoning that for centuries prevented women from attaining equal economic rights and professional status under the law. To resurrect this view is both to foreclose a personal and economic choice on the part of the surrogate mother, and to deny intending parents what may be their only means of procreating a child of their own genes. Certainly in the present case it cannot seriously be argued that Anna, a licensed vocational nurse who had done well in school and who had previously borne a child, lacked the intellectual wherewithal or life experience necessary to make an informed decision to enter into the surrogacy contract.

---

[12]See Andrews and Douglass, *Alternative Reproduction* (1991) 65 So.Cal.L.Rev. 623, 673-678.

## Constitutionality of the Determination That Anna Johnson
## Is Not the Natural Mother

Anna argues at length that her right to the continued companionship of the child is protected under the federal Constitution.

First, we note the constitutional rights that are *not* implicated here.

There is no issue of procedural due process: although Anna broadly contends that the procedures prescribed for adoptions should be followed in the situation of a gestational surrogate's relinquishment to the genetic parents of the child she has carried and delivered, she cites no specific deficiency in the notice or hearing this matter received.

Furthermore, neither Anna nor amicus curiae ACLU articulates a claim under the equal protection clause, and we are unable to discern in these facts the necessary predicate to its operation. This is because a woman who voluntarily agrees to gestate and deliver for a married couple a child who is their genetic offspring is situated differently from the wife who provides the ovum for fertilization, intending to mother the resulting child.

Anna relies mainly on theories of substantive due process, privacy, and procreative freedom, citing a number of decisions recognizing the fundamental liberty interest of natural parents in the custody and care of their children. (See, e.g., *Santosky* v. *Kramer* (1982) 455 U.S. 745, 768 [71 L.Ed.2d 599, 616, 102 S.Ct. 1388]; *Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18, 27 [68 L.Ed.2d 640, 649, 101 S.Ct. 2153]; *Smith* v. *Organization of Foster Families* (1977) 431 U.S. 816, 842 [53 L.Ed.2d 14, 33-34, 97 S.Ct. 2094]; *Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558, 92 S.Ct. 1208].) Most of the cases Anna cites deal with the rights of unwed fathers in the face of attempts to terminate their parental relationship to their children. (See, e.g., *Stanley* v. *Illinois, supra*, 405 U.S. at pp. 658-659 [31 L.Ed.2d at pp. 562-563]; *Quilloin* v. *Walcott* (1978) 434 U.S. 246, 247-248 [54 L.Ed.2d 511, 515-516, 98 S.Ct. 549]; *Caban* v. *Mohammed* (1979) 441 U.S. 380 [60 L.Ed.2d 297, 99 S.Ct. 1760]; *Lehr* v. *Robertson* (1983) 463 U.S. 248 [77 L.Ed.2d 614, 103 S.Ct. 2985].) These cases do not support recognition of parental rights for a gestational surrogate. Although Anna quotes language stressing the primacy of a developed parent-child relationship in assessing unwed fathers' rights (see *Lehr* v. *Robertson, supra*, 463 U.S. at pp. 260-262 [77 L.Ed.2d at pp. 625-627]), certain language in the cases reinforces the importance of genetic parents' rights. (*Lehr* v. *Robertson, supra*, 463 U.S. at p. 262 [77 L.Ed.2d at p. 627] ["The significance of the biological connection is that it offers the natural

father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development."]; see also *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 838 [4 Cal.Rptr.2d 615, 823 P.2d 1216] ["The biological connection between father and child is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full and enduring relationship."].)

Anna's argument depends on a prior determination that she is indeed the child's mother. Since Crispina is the child's mother under California law because she, not Anna, provided the ovum for the in vitro fertilization procedure, intending to raise the child as her own, it follows that any constitutional interests Anna possesses in this situation are something less than those of a mother. As counsel for the minor points out, the issue in this case is not whether Anna's asserted rights as a natural mother were unconstitutionally violated, but rather whether the determination that she is not the legal natural mother at all is constitutional.[13]

Anna relies principally on the decision of the United States Supreme Court in *Michael H. v. Gerald D.* (1989) 491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333], to support her claim to a constitutionally protected liberty interest in the companionship of the child, based on her status as "birth mother." In that case, a plurality of the court held that a state may constitutionally deny a man parental rights with respect to a child he fathered during a liaison with the wife of another man, since it is the marital family that traditionally has been accorded a protected liberty interest, as reflected in the historic presumption of legitimacy of a child born into such a family. (491 U.S. at pp. 124-125 [105 L.Ed.2d at pp. 106-107] (plur. opn. by Scalia, J.).) The reasoning of the plurality in *Michael H.* does not assist Anna. Society has not traditionally protected the right of a woman who gestates and delivers a baby pursuant to an agreement with a couple who supply the zygote from which the baby develops and who intend to raise the child as their own; such arrangements are of too recent an origin to claim the protection of tradition. To the extent that tradition has a bearing on the present case, we believe it supports the claim of the couple who exercise their right to procreate in order to form a family of their own, albeit through novel medical procedures.

---

[13]The trial court analogized Anna's relationship with the child to that of a foster mother, whose liberty interest, if any, in her relationship with the foster child is surely more attenuated than that of the natural parents with the child. (See *Smith* v. *Organization of Foster Families, supra,* 431 U.S. at pp. 845-847 [53 L.Ed.2d at pp. 35-37] [declining to define the constitutional contours of the foster relationship].)

Moreover, if we were to conclude that Anna enjoys some sort of liberty interest in the companionship of the child, then the liberty interests of Mark and Crispina, the child's natural parents, in their procreative choices and their relationship with the child would perforce be infringed. Any parental rights Anna might successfully assert could come only at Crispina's expense. As we have seen, Anna has no parental rights to the child under California law, and she fails to persuade us that sufficiently strong policy reasons exist to accord her a protected liberty interest in the companionship of the child when such an interest would necessarily detract from or impair the parental bond enjoyed by Mark and Crispina.

Amicus curiae ACLU urges that Anna's right of privacy, embodied in the California Constitution (Cal. Const., art. I, § 1), requires recognition and protection of her status as "birth mother." We cannot agree. Certainly it is true that our state Constitution has been construed to provide California citizens with privacy protections encompassing procreative decisionmaking —broader, indeed, than those recognized by the federal Constitution. (Compare *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 263 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118] with *Harris* v. *McRae* (1980) 448 U.S. 297, 315-318 [65 L.Ed.2d 784, 803-806, 100, S.Ct. 2671] [reaching opposing results on the question of whether state and federal Constitutions, respectively, permit legislative denial of funding for abortions for indigent women].) However, amicus curiae fails to articulate persuasively how Anna's claim falls within even the broad parameters of the state right of privacy. Amicus curiae appears to assume that the choice to gestate and deliver a baby for its genetic parents pursuant to a surrogacy agreement is the equivalent, in constitutional weight, of the decision whether to bear a child of one's own. We disagree. A woman who enters into a gestational surrogacy arrangement is not exercising her own right to make procreative choices; she is agreeing to provide a necessary and profoundly important service without (by definition) any expectation that she will raise the resulting child as her own.

Drawing an analogy to artificial insemination, Anna argues that Mark and Crispina were mere genetic donors who are entitled to no constitutional protection. That characterization of the facts is, however, inaccurate. Mark and Crispina never intended to "donate" genetic material to anyone. Rather, they intended to procreate a child genetically related to them by the only available means. Civil Code section 7005, governing artificial insemination, has no application here.[14]

Finally, Anna argues that the Act's failure to address novel reproductive techniques such as in vitro fertilization indicates legislative disapproval of

---

[14]Civil Code section 7005 provides as follows: "(a) If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen

such practices. Given that the Act was drafted long before such techniques were developed, we cannot agree. Moreover, we may not arrogate to ourselves the power to disapprove them. It is not the role of the judiciary to inhibit the use of reproductive technology when the Legislature has not seen fit to do so; any such effort would raise serious questions in light of the fundamental nature of the rights of procreation and privacy. Rather, our task has been to resolve the dispute before us, interpreting the Act's use of the term "natural mother" (Civ. Code, § 7003, subd. (1)) when the biological functions essential to bringing a child into the world have been allocated between two women.

### DISPOSITION

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Baxter, J., and George, J., concurred.

**ARABIAN, J., Concurring.**—I concur in the decision to find under the Uniform Parentage Act that Crispina Calvert is the natural mother of the child she at all times intended to parent and raise as her own with her husband Mark, the child's natural father. That determination answers the question on which this court granted review, and in my view sufficiently resolves the controversy between the parties to warrant no further analysis. I therefore decline to subscribe to the dictum in which the majority find surrogacy contracts "not . . . inconsistent with public policy." (Maj. opn., *ante*, pp. 95-97.)

Surrogacy contracts touch upon one of the most, if not *the* most, sensitive subjects of human endeavor. Not only does the birth of a new generation perpetuate our species, it allows every parent to contribute, both genetically and socially, to our collective understanding of what it means to be human. Every child also offers the opportunity of a unique lifetime relationship, potentially more satisfying and fulfilling than any other pursuit. (See *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 837 [4 Cal.Rptr.2d 615, 823 P.2d 1216].)

---

donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. The husband's consent must be in writing and signed by him and his wife. The physician shall certify their signatures and the date of the insemination, and retain the husband's consent as part of the medical record, where it shall be kept confidential and in a sealed file. However, the physician's failure to do so does not affect the father and child relationship. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician or elsewhere, are subject to inspection only upon an order of the court for good cause shown. [¶] (b) The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived."

The multiplicity of considerations at issue in a surrogacy situation plainly transcend traditional principles of contract law and require careful, nonadversarial analysis. For this reason, I do not think it wise for this court to venture unnecessarily into terrain more appropriately cleared by the Legislature in the first instance. In this regard, the Florida Supreme Court made the following pertinent observations; although the factual context obviously differs, socially and morally it compares in the most profound respects: "Because the issue with all its ramifications is fraught with complexity and encompasses the interests of the law, both civil and criminal, medical ethics and social morality, it is not one which is well-suited for resolution in an adversary judicial proceeding. It is the type [of] issue which is more suitably addressed in the legislative forum, where fact finding can be less confined and the viewpoints of all interested institutions and disciplines can be presented and synthesized. In this manner only can the subject be dealt with comprehensively and the interests of all institutions and individuals be properly accommodated." (*Satz* v. *Perlmutter* (Fla. 1980) 379 So.2d 359, 360, affg. (Fla.Dist.Ct.App. 1978) 362 So.2d 160.) The New Jersey Supreme Court echoed similar cautionary tones in *Matter of Conroy* (1985) 98 N.J. 321 [486 A.2d 1209, 48 A.L.R.4th 1]: "As an elected body, the Legislature is better able than any other single institution to reflect the social values at stake. In addition, it has the resources and ability to synthesize vast quantities of data and opinions from a variety of fields and to formulate general guidelines that may be applicable to a broad range of situations." (*Id.*, 486 A.2d at pp. 1220-1221; accord, *Matter of Guardianship of Hamlin* (1984) 102 Wn.2d 810, 821-822 [689 P.2d 1372, 1378-1379].)

Clearly, this court should not avoid proper resolution of the issue before it. "[T]he law, equity and justice must not themselves quail and be helpless in the face of modern technological marvels presenting questions hitherto unthought of." (*In re Quinlan* (1976) 70 N.J. 10, 44 [355 A.2d 647, 665, 79 A.L.R.3d 205], cert. den. *sub nom. Garger* v. *New Jersey*, 429 U.S. 922 [50 L.Ed.2d 289, 97 S.Ct. 319].) Nevertheless, I would not move beyond the available legal mechanism into such socially and morally uncharted waters. The implications of addressing the general soundness of surrogacy contracts are vast and profound. To date, the legislative process has failed to produce a satisfactory answer. This court should be chastened and not emboldened by that failure.

**KENNARD, J.,** Dissenting.—When a woman who wants to have a child provides her fertilized ovum to another woman who carries it through pregnancy and gives birth to a child, who is the child's legal mother? Unlike the majority, I do not agree that the determinative consideration should be the intent to have the child that originated with the woman who contributed

the ovum. In my view, the woman who provided the fertilized ovum and the woman who gave birth to the child both have substantial claims to legal motherhood. Pregnancy entails a unique commitment, both psychological and emotional, to an unborn child. No less substantial, however, is the contribution of the woman from whose egg the child developed and without whose desire the child would not exist.

For each child, California law accords the legal rights and responsibilities of parenthood to only one "natural mother." When, as here, the female reproductive role is divided between two women, California law requires courts to make a decision as to which woman is the child's natural mother, but provides no standards by which to make that decision. The majority's resort to "intent" to break the "tie" between the genetic and gestational mothers is unsupported by statute, and, in the absence of appropriate protections in the law to guard against abuse of surrogacy arrangements, it is ill-advised. To determine who is the legal mother of a child born of a gestational surrogacy arrangement, I would apply the standard most protective of child welfare—the best interests of the child.

## I. FACTUAL BACKGROUND

This case arises from an agreement made between Mark and Crispina Calvert, a married couple, and Anna Johnson, a single woman. As the result of a hysterectomy, Crispina was unable to become pregnant, although her ovaries could still produce eggs. When she and her husband Mark desired to have a child, they arranged with Anna for Anna's impregnation with an embryo formed from Crispina's egg and Mark's sperm. Mark and Crispina agreed to pay Anna installment payments totaling $10,000, the last installment not due until six weeks after Anna gave birth. In exchange, Anna agreed to carry the child to term and, after giving birth, to relinquish her parental rights to the child.

Six months into the pregnancy, Anna's relationship with Mark and Crispina broke down. Both sides filed lawsuits seeking declarations of parental rights in the unborn child. While these consolidated actions were still pending, on September 19, 1990, Anna gave birth. By agreement of the parties, the court awarded immediate custody of the child to Mark and Crispina, but granted visitation rights to Anna.

The matter went to trial in October 1990. The parties stipulated that Mark and Crispina were the genetic parents of the child to whom Anna had given birth. The trial court ruled in favor of Mark and Crispina, concluding that as the child's "genetic" and "biological" father and mother, they were also his "natural" father and mother. The Court of Appeal affirmed.

We granted review to address an issue of first impression: Under California law, how does a court determine who is the legal mother of a child born of a gestational surrogacy arrangement?

## II. THIS OPINION'S APPROACH

The determination of a question of parental rights to a child born of a surrogacy arrangement was before the New Jersey Supreme Court in *Matter of Baby M.* (1988) 109 N.J. 396 [537 A.2d 1227, 77 A.L.R.4th 1], a case that received worldwide attention. But in the surrogacy arrangement at issue there the woman who gave birth to the child, Marybeth Whitehead, had been impregnated by artificial insemination with the sperm of the intending father, William Stern. Whitehead thus provided the genetic material and carried the fetus to term. This case is different, because here those two aspects of the female role in reproduction were divided between two women. This process is known as "gestational" surrogacy, to distinguish it from the surrogacy arrangement involved in *Baby M.*[1]

In this opinion, I first discuss gestational surrogacy in light of the medical advances that have made it a reality. I next consider the wider social and philosophical implications of using gestational surrogacy to give birth to a child, and set out some of the suggested models for deciding the child's parentage in this situation. I then review a comprehensive model legislative scheme, not enacted in California, designed to accommodate the interests of all participants in surrogacy arrangements. I next turn to California's Uniform Parentage Act, and critique the majority's reliance on "intent" as the determinative factor under that act in deciding who is the "natural," and thus legal, mother of a child born of a gestational surrogacy arrangement. Finally, I explain why, in the absence of legislation designed to address the unique problems of gestational surrogacy, courts deciding who is the legal mother of a child born of gestational surrogacy should look to the best interests of that child.

---

[1]The terms "surrogacy" and "surrogate" have been criticized as being inaccurate, particularly when applied to the type of arrangement involved in *Baby M.*, in which the child a woman bears, intending to relinquish at birth, was formed from her own egg. (See Capron & Radin, *Choosing Family Law Over Contract Law as a Paradigm for Surrogate Motherhood*, in Surrogate Motherhood (Gostin edit. 1990) p. 72, fn. 2; Annas, *Fairy Tales Surrogate Mothers Tell*, in Surrogate Motherhood, *supra*, at p. 46 [suggesting that the phrase "surrogate mother" derives from Harlow's monkey studies, in which the responses of newborn monkeys were tested by isolating them in cages with cloth or wire "surrogate mothers."].)

Because "gestational surrogacy" is now widely used to describe the situation in which one woman agrees to be impregnated with an embryo formed from another woman's fertilized egg, I use the phrase throughout this opinion and occasionally also refer to the woman who gestates the fetus as the "surrogate."

## III. Gestational Surrogacy

Recent advances in medical technology have dramatically expanded the means of human reproduction. Among the new technologies are in vitro fertilization, embryo and gamete freezing and storage, gamete intra-fallopian transfer, and embryo transplantation. (Shultz, *Reproductive Technology and Intent-Based Parenthood: An Opportunity for Gender Neutrality*, 1990 Wis.L.Rev. 297, 299 fn. 5 [hereafter *Reproductive Technology*].) Gestational surrogacy is the result of two of these techniques: in vitro fertilization and embryo transplantation. (See Shalev, Birth Power: The Case for Surrogacy (Yale U. Press 1989) p. 115.)

In vitro fertilization or IVF is the fertilization of a human egg outside the human body in a laboratory. Children that have been conceived this way are often called "test tube babies," because their actual conception took place in a petri dish. The first live birth of a child conceived in vitro occurred in 1979 in Great Britain after 20 years of research by a British team. (Shalev, Birth Power: The Case for Surrogacy, *supra*, at p. 105.)

To facilitate the retrieval or "harvesting" of eggs for in vitro fertilization, a woman ingests fertility hormones to induce "superovulation" or the production of multiple eggs. The eggs are then removed through aspiration, a nonsurgical technique, or through an invasive surgical procedure known as laparoscopy. (See generally *Developments in the Law: Medical Technology and the Law* (1990) 103 Harv.L.Rev. 1519, 1537-1542 [hereafter *Medical Technology*].) To undergo superovulation and egg retrieval is taxing, both physically and emotionally; the hormones used for superovulation produce bodily changes similar to those experienced in pregnancy, while the surgical removal of mature eggs has been likened to caesarian-section childbirth. (*Id.*, at p. 1540; Shalev, Birth Power: The Case for Surrogacy, *supra*, at pp. 117-118.)

After removal, eggs are exposed to live sperm in a petri dish. If an egg is fertilized, the resulting zygote is allowed to divide and become multicellular before uterine implantation. The expense and low success rate of in vitro fertilization demonstrate just how much prospective parents are willing to endure to achieve biological parenthood. (*Medical Technology, supra,* 103 Harv.L.Rev. at p. 1539.)

Generally, an egg fertilized in vitro is implanted in the uterus of the woman who produced it. The technique, however, allows for embryo transplantation, which is the transfer of an embryo formed from one woman's egg to the uterus of another woman who will gestate the fetus to term. This can

take place in at least three different situations: (1) a woman may donate an egg that, when fertilized, will be implanted in the uterus of a woman who intends to raise the child; (2) the woman who provides the egg may herself intend to raise the child carried to term by a gestational surrogate; or (3) a couple desiring a child may arrange for a surrogate to gestate an embryo produced from an egg and sperm, both donated (perhaps by close relatives of the couple). (Goodwin, *Determination of Legal Parentage in Egg Donation, Embryo Transplantation, and Gestational Surrogacy Arrangements* (1992) 26 Fam.L.Q. 275, 276-277 [hereafter *Determination of Legal Parentage*].)

The division of the female reproductive role in gestational surrogacy points up the three discrete aspects of motherhood: genetic, gestational and social. The woman who contributes the egg that becomes the fetus has played the genetic role of motherhood; the gestational aspect is provided by the woman who carries the fetus to term and gives birth to the child; and the woman who ultimately raises the child and assumes the responsibilities of parenthood is the child's social mother. (Shalev, Birth Power: The Case for Surrogacy, *supra*, at p. 115; see also Macklin, *Artificial Means of Reproduction and Our Understanding of the Family* (1991) 21 Hastings Center Rep. 5, 6.)

## IV. Policy Considerations

The ethical, moral and legal implications of using gestational surrogacy for human reproduction have engendered substantial debate. A review of the scholarly literature that addresses gestational surrogacy reveals little consensus on the desirability of surrogacy arrangements, particularly those involving paid surrogacy, or on how best to decide questions of the parentage of children born of such arrangements.

Surrogacy proponents generally contend that gestational surrogacy, like the other reproductive technologies that extend the ability to procreate to persons who might not otherwise be able to have children, enhances "individual freedom, fulfillment and responsibility." (Shultz, *Reproductive Technology, supra,* 1990 Wis.L.Rev. 297, 303.) Under this view, women capable of bearing children should be allowed to freely agree to be paid to do so by infertile couples desiring to form a family. (Shalev, Birth Power: The Case for Surrogacy, *supra,* at p. 145 [arguing for a "free market in reproduction" in which the "reproducing woman" operates as an "autonomous moral and economic agent"]; see also Posner, Economic Analysis of Law (3d ed. 1986) p. 139; Landes & Posner, *The Economics of the Baby Shortage* (1978) 7 J. Legal Stud. 323 [proposing a "market in babies"].) The "surrogate mother" is expected "to weigh the prospective investment in her birthing labor"

before entering into the arrangement, and, if her "autonomous reproductive decision" is "voluntary," she should be held responsible for it so as "to fulfill the expectations of the other parties . . . ." (Shalev, Birth Power: The Case for Surrogacy, *supra*, at p. 96.)

One constitutional law scholar argues that the use of techniques such as gestational surrogacy is constitutionally protected and should be restricted only on a showing of a compelling state interest. (Robertson, *Procreative Liberty and the Control of Conception, Pregnancy, and Childbirth* (1983) 69 Va.L.Rev. 405; Robertson, *Procreative Liberty and the State's Burden of Proof in Regulating Noncoital Reproduction*, in Surrogate Motherhood, *supra*, pp. 24-26, 35; Robertson, *Embryos, Families, and Procreative Liberty: The Legal Structure of the New Reproduction* (1986) 59 So.Cal.L.Rev. 939, 960.) Professor Robertson reasons that procreation is itself protected under decisions of the United States Supreme Court that affirm the basic civil right to marry and raise children. (Robertson, *Procreative Liberty and the Control of Conception, Pregnancy, and Childbirth, supra*, 69 Va.L.Rev. at p. 414, fns. 22, 23, citing *Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399 [67 L.Ed. 1042, 1045, 43 S.Ct. 625, 29 A.L.R. 1446] ["right . . . to marry, establish a home and bring up children" protected by the Fourteenth Amendment]; *Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110] [describing marriage and procreation as basic human civil rights]; *Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208] [emphasizing the importance of the rights "to conceive and raise one's children"].) From this premise, he argues that the right to procreate should extend to persons who cannot conceive or bear children. (Robertson, *Procreative Liberty and the Control of Conception, Pregnancy and Childbirth, supra*, 69 Va.L.Rev. at p. 411 ["Sterility bars one from conceiving or bearing only to the extent that medicine or society cannot overcome the particular cause of infertility"]; Robertson, *Embryos, Families, and Procreative Liberty: The Legal Structure of the New Reproduction, supra*, 59 So.Cal.L.Rev. at p. 960 ["The use of noncoital techniques . . . should . . . also be protected."].)

Professor Robertson's thesis of broad application of the right of privacy for all procreational techniques has been questioned, however, in light of recent United States Supreme Court jurisprudence. (See *Medical Technology, supra*, 103 Harv.L.Rev. 1519, 1530, citing *Michael H.* v. *Gerald D.* (1989) 491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333], as evidence of the high court's reluctance "to extend the right of privacy to new relationships and activities" that the court has not perceived to merit "traditional protection.")

Surrogacy critics, however, maintain that the payment of money for the gestation and relinquishment of a child threatens the economic exploitation

of poor women who may be induced to engage in commercial surrogacy arrangements out of financial need. (Capron & Radin, *Choosing Family Law Over Contract Law as a Paradigm for Surrogate Motherhood*, in Surrogate Motherhood, *supra*, p. 62.) Some fear the development of a "breeder" class of poor women who will be regularly employed to bear children for the economically advantaged. (See *Women and Children Used in Systems of Surrogacy: Position Statement of the Institute on Women and Technology*, in Surrogate Motherhood, *supra*, at p. 322; and Corea, *Junk Liberty*, testimony before Cal. Assem. Judiciary Com., April 5, 1988, in Surrogate Motherhood, *supra*, at pp. 325, 335.) Others suggest that women who enter into surrogacy arrangements may underestimate the psychological impact of relinquishing a child they have nurtured in their bodies for nine months. (See Macklin, *Artificial Means of Reproduction and Our Understanding of the Family*, *supra*, 21 Hastings Center Rep. 5, 10.)

Gestational surrogacy is also said to be "dehumanizing" (Capron & Radin, *Choosing Family Law Over Contract Law as a Paradigm for Surrogate Motherhood*, in Surrogate Motherhood, *supra*, at p. 62) and to "commodify" women and children by treating the female reproductive capacity and the children born of gestational surrogacy arrangements as products that can be bought and sold (Radin, *Market-Inalienability* (1987) 100 Harv.L.Rev. 1849, 1930-1932). The commodification of women and children, it is feared, will reinforce oppressive gender stereotypes and threaten the well-being of all children. (*Medical Technology*, *supra*, 103 Harv.L.Rev. 1519, 1550; Annas, *Fairy Tales Surrogate Mothers Tell*, in Surrogate Motherhood, *supra*, p. 50.) Some critics foresee promotion of an ever-expanding "business of surrogacy brokerage." (E.g., Goodwin, *Determination of Legal Parentage*, *supra*, 26 Fam.L.Q. at p. 283.)

Whether surrogacy contracts are viewed as personal service agreements or agreements for the sale of the child born as the result of the agreement, commentators critical of contractual surrogacy view these contracts as contrary to public policy and thus not enforceable. (Radin, *Market-Inalienability*, *supra*, 100 Harv.L.Rev. at p. 1924, fn. 261; Capron & Radin, *Choosing Family Law Over Contract Law as a Paradigm for Surrogate Motherhood*, *supra*, in Surrogate Motherhood, at pp. 62-63; see also Krimmel, *Can Surrogate Parenting Be Stopped? An Inspection of the Constitutional and Pragmatic Aspects of Outlawing Surrogate Mother Arrangements* (1992) 27 Val.U.L.Rev. 1, 4-5.)

Organizations representing diverse viewpoints share many of the concerns highlighted by the legal commentators. For example, the American Medical Association considers the conception of a child for relinquishment after birth

to pose grave ethical problems. (Rep. of the Judicial Council, in Surrogate Motherhood, *supra*, at p. 304.) Likewise, the official position of the Catholic Church is that surrogacy arrangements are " 'contrary to the unity of marriage and to the dignity of the procreation of the human person.' " (Magisterium of the Catholic Church, Instruction on Respect for Human Life in Its Origin and on the Dignity of Procreation: Replies to Certain Questions of the Day 25 (Feb. 22, 1987), cited in Radin, *Market-Inalienability, supra*, 100 Harv.L.Rev. 1849, 1928, fn. 271.)

The policy statement of the New York State Task Force on Life and the Law sums up the broad range of ethical problems that commercial surrogacy arrangements are viewed to present: "The gestation of children as a service for others in exchange for a fee is a radical departure from the way in which society understands and values pregnancy. It substitutes commercial values for the web of social, affective and moral meanings associated with human reproduction . . . . This transformation has profound implications for childbearing, for women, and for the relationship between parents and the children they bring into the world. [¶] . . . [¶] Surrogate parenting allows the genetic, gestational and social components of parenthood to be fragmented, creating unprecedented relationships among people bound together by contractual obligation rather than by the bonds of kinship and caring. . . . [¶] . . . [¶] . . . Surrogate parenting alters deep-rooted social and moral assumptions about the relationship between parents and children. . . . [¶] . . . [It] is premised on the ability and willingness of women to abdicate [their parental] responsibility without moral compunction or regret [and] makes the obligations that accompany parenthood alienable and negotiable." (New York State Task Force on Life and the Law, *Surrogate Parenting: Analysis and Recommendations for Public Policy* (May 1988) in Surrogate Motherhood, *supra*, at pp. 317-318.)

Proponents and critics of gestational surrogacy propose widely differing approaches for deciding who should be the legal mother of a child born of a gestational surrogacy arrangement. Surrogacy advocates propose to enforce pre-conception contracts in which gestational mothers have agreed to relinquish parental rights, and, thus, would make "bargained-for intentions determinative of legal parenthood." (Shultz, *Reproductive Technology, supra*, 1990 Wis.L.Rev. at p. 323.) Professor Robertson, for instance, contends that "The right to noncoital, collaborative reproduction also includes the right of the parties to agree how they should allocate their obligations and entitlements with respect to the child. Legal presumptions of paternity and maternity would be overridden by this agreement of the parties." (Robertson, *Procreative Liberty and the Control of Conception, Pregnancy, and Childbirth, supra*, 69 Va.L.Rev. 405, 436; see also Shalev, Birth Power: The Case

for Surrogacy, *supra*, at p. 141 [arguing for enforcing the parties' legal expectations].)

Surrogacy critics, on the other hand, consider the unique female role in human reproduction as the determinative factor in questions of legal parentage. They reason that although males and females both contribute genetic material for the child, the act of gestating the fetus falls only on the female. (See Radin, *Market-Inalienability, supra,* 100 Harv.L.Rev. 1849, 1932, fn. 285 [pointing out the "asymmetrical" interests of males and females in human reproduction].) Accordingly, in their view, a woman who, as the result of gestational surrogacy, is not genetically related to the child she bears is like any other woman who gives birth to a child. In either situation the woman giving birth is the child's mother. (See Capron & Radin, *Choosing Family Law Over Contract Law as a Paradigm for Surrogate Motherhood,* in Surrogate Motherhood, *supra,* at pp. 64-65.) Under this approach, the laws governing adoption should govern the parental rights to a child born of gestational surrogacy. Upon the birth of the child, the gestational mother can decide whether or not to relinquish her parental rights in favor of the genetic mother. (*Ibid.*)

## V. MODEL LEGISLATION

The debate over whom the law should recognize as the legal mother of a child born of a gestational surrogacy arrangement prompted the National Conference of Commissioners on Uniform State Laws to propose the Uniform Status of Children of Assisted Conception Act. (9B West's U. Laws Ann. (1992 Supp.) Uniform Status of Children of Assisted Conception Act (1988 Act) pp. 122-137 [hereafter also USCACA].) This model legislation addresses many of the concerns discussed above.

The commissioners gave careful consideration to the competing interests of the various participants in assisted conception arrangements, and sought to accommodate those interests in the model legislation. Their overriding concern, however, was the well-being of children born of gestational surrogacy and other types of assisted conception. As the foreword to the model legislation notes, the extraordinary circumstances of these children's births deprive them of parentage in the traditional sense. (9B West's U. Laws Ann. (1992 Supp.) USCACA, *supra,* at p. 123.) Thus, the intent of the proposed legislation was to define with precision the legal status of these children as well as to codify the rights of the other participants in a surrogacy arrangement. The commissioners proposed alternative versions of the USCACA: one that would disallow gestational surrogacy and another that would permit it only under court supervision.

In its key components, the proposed legislation provides that "a woman who gives birth to a child is the child's mother" (USCACA, § 2) unless a court has approved a surrogacy agreement before conception (USCACA, § 5, 6). In the absence of such court approval, any surrogacy agreement would be void. (USCACA, § 5, subd. (b).) If, however, the arrangement for gestational surrogacy has court approval, "the intended parents are the parents of the child." (USCACA, § 8, subd. (a)(1).)

To obtain court approval, the parties to the surrogacy arrangement must file a petition. (USCACA, § 6, subd. (a).) The model legislation provides for the court to appoint a guardian ad litem for the intended child and legal counsel for the surrogate mother. (*Ibid.*) Before approving a surrogacy arrangement, the trial court must conduct a hearing and enter detailed findings, including the following: medical evidence shows the intended mother's inability to bear a child or that for her to do so poses an unreasonable risk to the unborn child or to the physical or mental health of the intended mother; all parties to the surrogacy agreement (including the surrogate's husband if she has one) meet the standards of fitness of adoptive parents; the agreement was voluntary and all parties understand its terms; the surrogate mother has undergone at least one successful pregnancy and medical evidence shows that another pregnancy will not endanger her physical or mental health or pose an unreasonable risk to the unborn child; and all parties have received professional mental health counseling pertaining to the effect of the surrogacy arrangement. (USCACA, § 6, subd. (b).) These provisions serve to minimize the potential for overreaching and to ensure that all parties to a surrogacy arrangement understand their respective roles and obligations.

The USCACA offers predictability in delineating the parentage of children born of gestational surrogacy arrangements. Under the model legislation, if enacted, there would never be a question as to who has the legal responsibility for a child born of a gestational surrogacy arrangement: If the couple who initiated the surrogacy had complied with the provisions of the legislation, they would be the child's legal parents. If they had not, the rights and responsibilities of parenthood would go to the woman who gave birth to the child and her spouse.

Because California Legislature has not enacted the Uniform Status of Children of Assisted Conception Act, its provisions were not followed in this case.

## VI. THE UNIFORM PARENTAGE ACT

The only California statute defining parental rights is the Uniform Parentage Act (hereafter also UPA). (See Civ. Code, § 7000 et seq.).[2] The Legislature enacted the UPA to abolish the concept of illegitimacy and to replace it with the concept of parentage. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 828 [4 Cal.Rptr.2d 615, 823 P.2d 1216].) The UPA was never intended by the Legislature to govern the issues arising from new reproductive technologies such as gestational surrogacy. Nevertheless, the UPA is on its face broadly applicable, and it is in any event the only statutory guidance this court has in resolving this case.

The provisions of the UPA "extend[ ] equally to every child and to every parent, regardless of the marital status of the parents." (§ 7002.) The parent-child relationship defined by the UPA accords a child's parents both rights and obligations. (§ 7001.) A primary focus of the UPA is the determination of paternity and enforcement of financial responsibility. (§§ 7006 [actions to determine paternity], 7012 [specifying financial support obligations].)

When a child is born by gestational surrogacy, as happened here, the two women who played biological roles in creating the child will both have statutory claims under the UPA to being the child's natural mother. The UPA permits a woman to establish that she is "the natural mother" of a child by "proof of . . . having given birth to the child . . . ." (§ 7003, subd. (1).) Thus, a gestational mother qualifies as a "natural mother" under the statute. (*Ibid.*) Alternatively, the UPA allows a woman to prove she is a mother in the same manner as a man may prove he is a father. (§§ 7003, subd. (1), 7015 [permitting actions to establish a mother and child relationship using parts of the UPA "applicable to the father and child relationship"].) A man may demonstrate he is a child's natural father through genetic marker evidence derived from blood testing. (§ 7004, subd. (a); Evid. Code, §§ 621, 892, 895.) Accordingly, a genetic mother may also demonstrate she is a child's natural mother through such genetic evidence. Here, both Anna, the gestational mother, and Crispina, the genetic mother, have offered proof acceptable under the UPA to qualify as the child's natural mother.

By its use of the phrase "*the* natural mother," however, the UPA contemplates that a child will have only one natural mother. (§ 7003, subd. (1), italics added.) But the UPA provides no standards for determining who that natural mother should be when, as here, two different women can offer biological proof of being the natural mother of the same child under its

---

[2]Further undesignated statutory references are to the Civil Code.

provisions. Thus, the UPA by its terms cannot resolve the conflict in this case.

## VII. ANALYSIS OF THE MAJORITY'S "INTENT" TEST

Faced with the failure of current statutory law to adequately address the issue of who is a child's natural mother when two women qualify under the UPA, the majority breaks the "tie" by resort to a criterion not found in the UPA—the "intent" of the genetic mother to be the child's mother.

This case presents a difficult issue. The majority's resolution of that issue deserves serious consideration. Ultimately, however, I cannot agree that "intent" is the appropriate test for resolving this case.

The majority offers four arguments in support of its conclusion to rely on the intent of the genetic mother as the exclusive determinant for deciding who is the natural mother of a child born of gestational surrogacy. Careful examination, however, demonstrates that none of the arguments mandates the majority's conclusion.

The first argument that the majority uses in support of its conclusion that the intent of the genetic mother to bear a child should be dispositive of the question of motherhood is "but-for" causation. Specifically, the majority relies on a commentator who writes that in a gestational surrogacy arrangement, " 'the child would not have been born *but for* the efforts of the intended parents." (Maj. opn., *ante*, at p. 94, quoting Hill, *What Does It Mean to Be a "Parent"? The Claims of Biology as the Basis for Parental Rights* (1991) 66 N.Y.U. L.Rev. 353, 415, original italics omitted, italics added.)

The majority's resort to "but-for" causation is curious. The concept of "but-for" causation is a "test used in determining tort liability . . . ." (Black's Law Dict. (6th ed. 1990) p. 200.) In California, the test for causation is whether the conduct was a "substantial factor" in bringing about the event. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1049, 1054, 1056 [1 Cal.Rptr.2d 913] [disapproving "but-for" jury instruction in tort cases].) Neither test for causation assists the majority, as I shall discuss.

The proposition that a woman who gives birth to a child after carrying it for nine months is a "substantial factor" in the child's birth cannot reasonably be debated. Nor can it reasonably be questioned that "but for" the gestational mother, there would not be a child. Thus, the majority's reliance on principles of causation is misplaced. Neither the "but for" nor the "substantial factor" test of causation provides any basis for preferring the

genetic mother's intent as the determinative factor in gestational surrogacy cases: Both the genetic and the gestational mothers are indispensable to the birth of a child in a gestational surrogacy arrangement.

Behind the majority's reliance on "but-for" causation as justification for its intent test is a second, closely related argument. The majority draws its second rationale from a student note: " 'The mental concept of the child is a controlling factor of its creation, and the originators of that concept merit full credit as conceivers.' " (Maj. opn., *ante*, at p. 94, quoting Note, *Redefining Mother: A Legal Matrix for New Reproductive Technologies* (1986) 96 Yale L.J. 187, 196.)

The "originators of the concept" rationale seems comfortingly familiar. The reason it seems familiar, however, is that it is a rationale that is frequently advanced as justifying the law's protection of intellectual property. As stated by one author, "an idea belongs to its creator because the idea is a manifestation of the creator's personality or self." (Hughes, *The Philosophy of Intellectual Property* (1988) 77 Geo. L.J. 287, 330.) Thus, it may be argued, just as a song or invention is protected as the property of the "originator of the concept," so too a child should be regarded as belonging to the originator of the concept of the child, the genetic mother.

The problem with this argument, of course, is that children are not property. Unlike songs or inventions, rights in children cannot be sold for consideration, or made freely available to the general public. Our most fundamental notions of personhood tell us it is inappropriate to treat children as property. Although the law may justly recognize that the originator of a concept has certain property rights in that concept, the originator of the concept of a child can have no such rights, because children cannot be owned as property. Accordingly, I cannot endorse the majority's "originators of the concept" or intellectual property rationale for employing intent to break the "tie" between the genetic mother and the gestational mother of the child.

Next, the majority offers as its third rationale the notion that bargained-for expectations support its conclusion regarding the dispositive significance of the genetic mother's intent. Specifically, the majority states that " 'intentions that are voluntarily chosen, deliberate, express and bargained-for ought presumptively to determine legal parenthood.' " (Maj. opn., *ante*, at p. 94, quoting Schultz, *Reproductive Technology*, *supra*, 1990 Wis. L.Rev. at p. 323.)

It is commonplace that, in real or personal property transactions governed by contracts, "intentions that are voluntarily chosen, deliberate, express and

bargained-for" ought presumptively to be enforced and, when one party seeks to escape performance, the court may order specific performance. (See, e.g., § 3384 et seq.; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 21, p. 698.) But the courts will not compel performance of all contract obligations. For instance, even when a party to a contract for personal services (such as employment) has wilfully breached the contract, the courts will not order specific enforcement of an obligation to perform that personal service. (§ 3390; see 11 Witkin, Summary of Cal. Law, *supra*, Equity, § 59, p. 736.) The unsuitability of applying the notion that, because contract intentions are "voluntarily chosen, deliberate, express and bargained-for," their performance ought to be compelled by the courts is even more clear when the concept of specific performance is used to determine the course of the life of a child. Just as children are not the intellectual property of their parents, neither are they the personal property of anyone, and their delivery cannot be ordered as a contract remedy on the same terms that a court would, for example, order a breaching party to deliver a truckload of nuts and bolts.

Thus, three of the majority's four arguments in support of its exclusive reliance on the intent of the genetic mother as determinative in gestational surrogacy cases cannot withstand analysis. And, as I shall discuss shortly, the majority's fourth rationale has merit, but does not support the majority's conclusion. But before turning to the majority's fourth rationale, I shall discuss two additional considerations, not noted by the majority, that in my view also weigh against utilizing the intent of the genetic mother as the sole determinant of the result in this case and others like it.

First, in making the intent of the genetic mother who wants to have a child the dispositive factor, the majority renders a certain result preordained and inflexible in every such case: as between an intending genetic mother and a gestational mother, the genetic mother will, under the majority's analysis, always prevail. The majority recognizes no meaningful contribution by a woman who agrees to carry a fetus to term for the genetic mother beyond that of mere employment to perform a specified biological function.

The majority's approach entirely devalues the substantial claims of motherhood by a gestational mother such as Anna. True, a woman who enters into a surrogacy arrangement intending to raise the child has by her intent manifested an assumption of parental responsibility in addition to her biological contribution of providing the genetic material. (See *Adoption of Kelsey S., supra*, 1 Cal.4th at pp. 838, 849.) But the gestational mother's biological contribution of carrying a child for nine months and giving birth is likewise an assumption of parental responsibility. (See Dolgin, *Just a Gene:*

*Judicial Assumptions About Parenthood* (1993) 40 UCLA L.Rev. 637, 659.) A pregnant woman's commitment to the unborn child she carries is not just physical; it is psychological and emotional as well. The United States Supreme Court made a closely related point in *Lehr* v. *Robertson* (1983) 463 U.S. 248 [77 L.Ed.2d 614, 103 S.Ct. 2985], explaining that a father's assertion of parental rights depended on his having assumed responsibility for the child after its birth, whereas a mother's "parental relationship is clear" because she "carries and bears the child." (*Id.* at p. 260, fn. 16 [77 L.Ed.2d at p. 626], quoting *Caban* v. *Mohammed* (1979) 441 U.S. 380, 397 [60 L.Ed.2d 297, 310, 99 S.Ct. 1760] (dis. opn. of Stewart, J.).)[3] This court too has acknowledged that a pregnant woman and her unborn child comprise a "unique physical unit" and that the welfare of each is "intertwined and inseparable." (*Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1080 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) Indeed, a fetus would never develop into a living child absent its nurturing by the pregnant woman. (See Tribe, American Constitutional Law (2d ed. 1988) at p. 1357, citing Law, *Rethinking Sex and the Constitution* (1984) 132 U.Pa.L.Rev. 955, 1023.) A pregnant woman intending to bring a child into the world is more than a mere container or breeding animal; she is a conscious agent of creation no less than the genetic mother, and her humanity is implicated on a deep level. Her role should not be devalued.

To summarize, the woman who carried the fetus to term and brought a child into the world has, like the genetic mother, a substantial claim to be the natural mother of the child. The gestational mother has made an indispensable and unique biological contribution, and has also gone beyond biology in an intangible respect that, though difficult to label, cannot be denied. Accordingly, I cannot agree with the majority's devaluation of the role of the gestational mother.

I find the majority's reliance on "intent" unsatisfactory for yet another reason. By making intent determinative of parental rights to a child born of

---

[3]In my view, the United States Supreme Court's decision in *Lehr* v. *Robertson, supra,* 463 U.S. 248, does not, despite the language I have just quoted, compel a conclusion that either the gestational mother or the genetic mother in a gestational surrogacy arrangement has, at the birth of the child, a fully vested and matured constitutional right to be a parent. Rather, I read the quoted language as indicating that the high court considers that a woman who conceives by traditional means and carries a fetus to term is a parent, and that a critical indicator of parenting status for a woman is gestation. Gestation is neither necessary nor sufficient to establish motherhood; it is, however, a factor the significance of which cannot be ignored, as the majority in effect does.

This reading of *Lehr* v. *Robertson* seems consistent with the plurality opinion in *Michael H.* v. *Gerald D., supra,* 491 U.S. 110, 123 [105 L.Ed.2d 91, 105-106], holding that a claim to fatherhood premised on biology plus "an established parental relationship" did not necessarily warrant constitutional protection. The court's precedents are, however, not entirely clear as to what will establish motherhood in a gestational surrogacy case, undoubtedly because the court has never dealt with such a case.

a gestational surrogacy arrangement, the majority would permit enforcement of a gestational surrogacy agreement without requiring any of the protections that would be afforded by the Uniform Status of Children of Assisted Conception Act. Under that act, the granting of parental rights to a couple that initiates a gestational surrogacy arrangement would be conditioned upon compliance with the legislation's other provisions. They include court oversight of the gestational surrogacy arrangement before conception, legal counsel for the woman who agrees to gestate the child, a showing of need for the surrogacy, medical and mental health evaluations, and a requirement that all parties meet the standards of fitness of adoptive parents. (USCACA, §§ 5, 6.)

In my view, protective requirements such as those set forth in the USCACA are necessary to minimize any possibility in gestational surrogacy arrangements for overreaching or abuse by a party with economic advantage. As the New Jersey Supreme Court recognized, it will be a rare instance when a low income infertile couple can employ an upper income surrogate. (*Matter of Baby M.*, *supra*, 537 A.2d 1227, 1249.) The model act's carefully drafted provisions would assure that the surrogacy arrangement is a matter of medical necessity on the part of the intending parents, and not merely the product of a desire to avoid the inconveniences of pregnancy, together with the financial ability to do so. Also, by requiring both pre-conception psychological counseling for all parties and judicial approval, the model act would assure that parties enter into a surrogacy arrangement only if they are legally and psychologically capable of doing so and fully understand all the risks involved, and that the surrogacy arrangement would not be substantially detrimental to the interests of any individual. Moreover, by requiring judicial approval, the model act would significantly discourage the rapid expansion of commercial surrogacy brokerage and the resulting commodification of the products of pregnancy. In contrast, here the majority's grant of parental rights to the intending mother contains no provisions for the procedural protections suggested by the commissioners who drafted the model act. The majority opinion is a sweeping endorsement of unregulated gestational surrogacy.

The majority's final argument in support of using the intent of the genetic mother as the exclusive determinant of the outcome in gestational surrogacy cases is that preferring the intending mother serves the child's interests, which are " '[u]nlikely to run contrary to those of adults who choose to bring [the child] into being.' " (Maj. opn., *ante*, at p. 94, quoting Schultz, *Reproductive Technology*, *supra*, 1990 Wis. L.Rev. at p. 397.)

I agree with the majority that the best interests of the child is an important goal; indeed, as I shall explain, the best interests of the child, rather than the

intent of the genetic mother, is the proper standard to apply in the absence of legislation. The problem with the majority's rule of intent is that application of this inflexible rule will not serve the child's best interests in every case.

I express no view on whether the best interests of the child in this case will be served by determining that the genetic mother is or is not the natural mother under California's Uniform Parentage Act. It may be that in this case the child's interests will be best served by recognizing Crispina as the natural mother. But this court is not just making a rule to resolve this case. Because the UPA does not adequately address the situation of gestational surrogacy, this court is of necessity making a rule that, unless new legislation is enacted, will govern all future cases of gestational surrogacy in California. And all future cases will not be alike. The genetic mother and her spouse may be, in most cases, considerably more affluent than the gestational mother. But "[t]he mere fact that a couple is willing to pay a good deal of money to obtain a child does not vouchsafe that they will be suitable parents . . . ." (Capron & Radin, *Choosing Family Law Over Contract Law as a Paradigm for Surrogate Motherhood*, in Surrogate Motherhood, *supra*, at pp. 65-66.) It requires little imagination to foresee cases in which the genetic mothers are, for example, unstable or substance abusers, or in which the genetic mothers' life circumstances change dramatically during the gestational mothers' pregnancies, while the gestational mothers, though of a less advantaged socioeconomic class, are stable, mature, capable and willing to provide a loving family environment in which the child will flourish. Under those circumstances, the majority's rigid reliance on the intent of the genetic mother will not serve the best interests of the child.

## VIII. The Best Interests of the Child

As I have discussed, in California the existing statutory law applicable to this case is the Uniform Parentage Act which was never designed to govern the new reproductive technology of gestational surrogacy. Under the UPA, both the genetic mother and the gestational mother have an equal right to be the child's natural mother. But the UPA allows one natural mother for each child, and thus this court is required to make a choice. To break this "tie" between the genetic mother and the gestational mother, the majority uses the legal concept of intent. In so doing, the majority has articulated a rationale for using the concept of intent that is grounded in principles of tort, intellectual property and commercial contract law.

But, as I have pointed out, we are not deciding a case involving the commission of a tort, the ownership of intellectual property, or the delivery of goods under a commercial contract; we are deciding the fate of a child. In

the absence of legislation that is designed to address the unique problems of gestational surrogacy, this court should look not to tort, property or contract law, but to family law, as the governing paradigm and source of a rule of decision.

The allocation of parental rights and responsibilities necessarily impacts the welfare of a minor child. And in issues of child welfare, the standard that courts frequently apply is the best interests of the child. (See §§ 222.20, 222.36, 224.64 [matters relating to adoption and temporary placement], 4600 [child custody], 4601 [visitation].) Indeed, it is highly significant that the UPA itself looks to a child's best interests in deciding another question of parental rights. (§ 7017, subd. (d)(2).) This "best interests" standard serves to assure that in the judicial resolution of disputes affecting a child's well-being, protection of the minor child is the foremost consideration. Consequently, I would apply "the best interests of the child" standard to determine who can best assume the social and legal responsibilities of motherhood for a child born of a gestational surrogacy arrangement.[4]

The determination of a child's best interests does not depend on the parties' relative economic circumstances, which in a gestational surrogacy situation will usually favor the genetic mother and her spouse. (See *Matter of Baby M.*, *supra*, 537 A.2d at p. 1249.) As this court has recognized, however, superior wealth does not necessarily equate with good parenting. (See *Burchard* v. *Garay* (1986) 42 Cal.3d 531, 540 [229 Cal.Rptr. 800, 724 P.2d 486, 62 A.L.R.4th 237].)

---

[4]In a footnote responding to this opinion, the majority confuses questions of custody, which I do not address, with the issue of maternal parentage, which I do address. (See maj. opn., *ante*, at p. 93, fn. 10.) The majority suggests that it is somehow inappropriate for a court to look to the child's best interests when deciding a question of parentage under the UPA; this is refuted by the express terms of the UPA itself, which, as noted above, requires the court to consider the child's best interests in deciding another question of parentage. (§ 7017, subd. (d)(2).)

The majority is also wrong when it suggests that the "best interests" approach for resolving the disputed issue of parentage, more than the majority's "intent" approach, raises the "specter of governmental interference" in fundamentally private matters. (Maj. opn., *ante*, at p. 93, fn. 10.) This court's grant of review to decide who is the natural mother of the child placed one branch of government squarely in the middle of this controversy—as did the parties' decisions to resort to the court system in the first place. Judicial resolution of family law matters, by its nature, necessarily involves some governmental interference in what would otherwise be private concerns.

On another point, the majority writes that the gestational mother could "voluntarily contract[ ] away any rights to the child," and that this would represent a "concession" as to the child's best interests. (Maj. opn., *ante*, at p. 93, fn. 10.) It is questionable whether the parentage of children is a proper subject of contract. But even assuming that a parent could contract away parental rights to a child—for instance, by selling the child into slavery—this would not logically amount to a binding "concession" that such a sale would be in the child's best interests.

Factors that are pertinent to good parenting, and thus that are in a child's best interests, include the ability to nurture the child physically and psychologically (Cahill, *The Ethics of Surrogate Motherhood: Biology, Freedom, and Moral Obligation*, in Surrogate Motherhood, *supra*, at p. 160), and to provide ethical and intellectual guidance (see *In re Marriage of Carney* (1979) 24 Cal.3d 725, 739 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028]). Also crucial to a child's best interests is the "well recognized right" of every child "to stability and continuity." (*Burchard v. Garay, supra*, 42 Cal.3d at p. 546 (conc. opn. of Mosk, J.).) The intent of the genetic mother to procreate a child is certainly relevant to the question of the child's best interests; alone, however, it should not be dispositive.

Here, the child born of the gestational surrogacy arrangement between Anna Johnson and Mark and Crispina Calvert has lived continuously with Mark and Crispina since his birth in September 1990. The trial court awarded parental rights to Mark and Crispina, concluding that as a matter of law they were the child's "genetic, biological and natural" parents.[5] In reaching that conclusion, the trial court did not treat Anna's statutory claim to be the child's legal mother as equal to Crispina's, nor did the trial court consider the child's best interests in deciding between those two equal statutory claims. Accordingly, I would remand the matter to the trial court to undertake that evaluation.

## CONCLUSION

Recent advances in medical technology have made it possible for the human female reproductive role to be divided between two women, the genetic mother and the gestational mother. Such gestational surrogacy arrangements call for sensitivity to each of the adult participants. But the paramount concern must be the well-being of the child that gestational surrogacy has made possible.

The model legislation proposed by the National Conference of Commissioners on Uniform Laws would protect such children's well-being by precisely defining their parentage. Such precision is not possible using a "best interests of the child" standard, which requires a case-by-case evaluation after the birth of the child. But that evaluation would afford many protections similar to those set out in USCACA, such as judicial oversight, legal counsel, and an opportunity for the court to determine who best can provide for the child.

I recognize that, for couples such as Mark and Crispina, gestational surrogacy offers the only hope of raising a child who is genetically related to

---

[5] It is uncontested that Mark is the natural father of this child.

both. But the desire for a genetically related child does not diminish the substantial concerns expressed by a broad spectrum of commentators that surrogacy left unregulated poses a fundamental threat to the well-being of women and children. This threat could largely be allayed by legislation permitting gestational surrogacy, but under court supervision and with the type of procedural requirements proposed in the USCACA that serve to protect all of those affected by a gestational surrogacy arrangement, particularly the child. In my view, the Legislature should turn its attention to the complex issues posed by gestational surrogacy.

In this opinion, I do not purport to offer a perfect solution to the difficult questions posed by gestational surrogacy; perhaps there can be no perfect solution. But in the absence of legislation specifically designed to address the complex issues of gestational surrogacy and to protect against potential abuses, I cannot join the majority's uncritical validation of gestational surrogacy.

I would reverse the judgment of the Court of Appeal, and remand the case to the trial court for a determination of disputed parentage on the basis of the best interests of the child.