IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 19, 2004 Session

IN RE:  C.K.G., C.A.G., C.L.G.

Appeal from the Juvenile Court for Williamson County
No. 38410     Lonnie Hoover, Judge

No. M2003-01320-COA-R3-JV - Filed June 22, 2004

Unmarried couple in their forties decide to have children. Due to the woman's concern that she may be too old to produce viable eggs, the couple engaged the services of an *in vitro* fertilization clinic and signed contracts required by the clinic, following which the clinic obtained eggs from an anonymous female donor, which were fertilized with the man's sperm and then implanted in the woman who carried them full term resulting in the birth of triplets.  Thereafter, the couple separated and the woman filed for custody.  The man answered and asserted that the woman is not the mother or a legal parent of the children because she was merely a gestational surrogate who has no genetic tie to the children.  The man further asserted that the children have no mother because the egg donor waived her parental rights.  The trial court held that the woman is the mother of the children, awarded joint custody to the couple and primary custody to the woman.  The man appealed.  We affirm, finding that the woman is a legal parent and the mother of the children based on the intent of the parties.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, J.J., joined.

P. Edward Schell, Franklin, Tennessee, and Clark L. Shaw, Nashville, Tennessee, for the appellant, father of the children.

Pamela M. Spicer and W. Allen Barrett, Nashville, Tennessee, for the appellee.

**OPINION**

The father of the children (whom we identify as Charles) presents three issues. First, whether the court erred in finding that the gestational surrogate (whom we identify as Pepper) is the mother of the children.[1] Second, whether the court erred in its application of the comparative fitness standard in determining custody of the children. Third, whether the court erroneously applied the "Tender Years Doctrine" when it designated Pepper as the primary custodian.

This case was initiated by Pepper who filed a Petition to Establish Paternity in the Juvenile Court for Williamson County, and asked the court to award the care, custody and control of the children to her. Charles answered denying that Pepper is the mother of the children. By counter petition, Charles sought sole care, custody and control of the children, asserting that Pepper served as a "gestational surrogate" and that she has no legal standing to assert any rights to custody and/or visitation of the children.

Procedural History and Facts

Pepper and Charles were never married. They began dating in 1994 and started discussing having a family in 1999. Pepper, who was 45 years of age, was concerned that she could not produce viable eggs. As a result, Pepper and Charles selected *in vitro* fertilization as the method of conceiving the children.

As part of the *in vitro* fertilization procedures, Pepper and Charles signed several documents including a RECIPIENT CONSENT FOR DONATION OF OOCYTES BY ANONYMOUS DONOR, which described the procedure, its risks, relationships between the parties, and the responsibilities of the parties. Significantly, this document provided:

> I, [Pepper] (wife), understand that the child(ren) conceived by this method will not have my genetic material, but will have that of the oocyte donor and my husband. However, regardless of the outcome, I will be the mother of any child(ren) born to me as a result of egg donation and hereby accept all the legal responsibilities required of such a parent.

This document was signed by Pepper as "wife" and Charles as "husband" and was witnessed and signed by a physician indicating that the treatment had been fully explained to the patient (Pepper) and husband (Charles) and that all of the patient's questions had been answered. Pepper and Charles also signed a document entitled INFORMED CONSENT FOR CRYOPRESERVATION AND PREFREEZE AGREEMENT FOR THE DISPOSITION OF

---

[1] The middle section of this court does not identify the children in paternity actions to maintain their anonymity. For the same reason, we do not identify nor use the parents/parties real names. Accordingly, we have given each parent a fictitious name. We refer to the father of the children as "Charles" and the woman who claims to be the mother of the children as "Pepper."

-2-

HUMAN EMBRYOS and a document entitled CONSENT AND RELEASE EMBRYO CRYO-STORAGE. These documents also were signed by Pepper and Charles as "wife" and "husband" and witnessed and signed by a physician.

Two eggs obtained from an anonymous donor were fertilized with Charles's sperm and the two embryos were placed in Pepper's womb. One of the embryos separated resulting in their being three embryos. After carrying the children to term, Pepper gave birth to triplets. Birth certificates for each of the children identify Pepper as the mother and Charles as the father.

Prior to the birth of the children, Charles moved into Pepper's home, lived with Pepper and cooked and ran errands for her. In anticipation of the birth of the children, Pepper and Charles discussed the need for a larger home. They soon purchased a home as tenants in common. The deed to the home identifies Charles and Pepper as unmarried. Pepper and Charles moved into the home with the children in August of 2001. Pepper subsequently sold her home in which the couple and children had been living.

Soon after the couple moved into the larger home, a nanny was hired to assist with the children's care. Thereafter, the relationship between Pepper and Charles deteriorated. Charles began to withhold financial support to Pepper and for the children. Pepper then filed her petition to establish paternity, obtain custody and child support.

The parties stipulated that DNA testing had been completed on the children[2] and Pepper and Charles; that Charles fertilized the anonymously donated eggs; that the fertilized eggs were then implanted in Pepper; that Pepper carried the children to term and gave birth to the children; and that DNA testing shows that Charles is the biological father of all three children and that Pepper did not provide any genetic material to any of the three children.

The Juvenile Court ruled that Pepper "is the legal mother of these three (3) minor children with all the rights, privileges and obligations as if she were their biological mother." The court further ruled that the parties shall have joint custody and that Pepper shall serve as the primary custodian.

An appellate court's review of a trial court's findings of fact is *de novo* upon the record of the trial court accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Unless there is an error of law, we must affirm the trial court's decision as long as the evidence does not preponderate against the findings. *Umstot v. Umstot*, 968 S.W.2d 819, 821 (Tenn. Ct. App. 1997). Our review of the trial court's determination of questions of law is *de novo* and the trial court's conclusions of law are not afforded a presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

_____

[2]Because two of the children are fraternal twins, testing was only performed on one of the twins. Both Pepper and Charles stipulated that the DNA test results for the one twin tested would apply to both.

## Is Pepper the Mother?

Charles asserts that Pepper is not the "mother" of the children.  Indeed, Charles argues that the children have no mother.

The children were conceived by *in vitro* fertilization whereby Charles's sperm was used to fertilize eggs contributed by an anonymous third-party donor, not Pepper.  Thus, Charles and another woman genetically conceived the children.  Charles asserts that since Pepper did not genetically conceive the children, she is not their mother.  This argument is primarily based on the paternity and adoption statutes of Tennessee.

The paternity statute, Tenn. Code Ann. § 36-2-302, defines "parent" as "the biological mother or biological father of a child, regardless of the marital status of the mother and father."  The paternity statute does not define the term "biological mother;" however, the adoption statute, Tenn. Code Ann.§ 36-1-102 (10), defines "biological parents" as "the woman and man who physically or *genetically conceived the child* who is the subject of the adoption or termination proceedings. . . ." (emphasis added)  Charles relies on these definitions to contend that Pepper is not a biological parent because she is not the woman who genetically conceived the children and cannot be the biological mother.

Charles contends that the female legal parent must be either the "biological" mother or the "adoptive" mother.  Thus, if Pepper is neither the adoptive mother, which she is not, nor the biological mother, which she is not, then, Charles asserts, she is not the mother nor a legal parent of the children.  Charles further contends that Pepper is merely the surrogate and that surrogates have no parental rights.

This is a case of first impression in Tennessee.  Authorities from other jurisdictions are divided into two groups,  those that resolve issues of parentage according to genetics, and those that look to the intent of the parties.  Charles relies on those decided by genetics, including *Belsito v. Clark*, 644 N. E.2d 760 (Ohio Ct. Common Pleas 1994), and *Culliton v. Beth Israel Deaconess Med. Ctr.*, 756 N. E.2d 1133 (Mass. 2001).  Conversely, Pepper argues that the parties' intent should control, relying on numerous cases from other jurisdictions including *Johnson v. Calvert,* 851 P. 2d 776 (Cal. 1993) and *In re Marriage of Buzzanca*, 61 Cal. App. 4th 1410 (4th Dist. 1998).  Charles counters, arguing that the intent of the parties approach contravenes Tennessee law.  He principally relies on *In re Thompson*, 11 S.W.3d 913 (Tenn. Ct. App. 1999) which held that a non-biological, non-adoptive "parent" has no right to custody or visitation.

Pepper's "intent" argument is based upon the fact that Charles expressed the unequivocal intent that she would be the mother, which is expressed in the agreements they signed with the fertility clinic.  She argues the intent is evident from the fact that she is identified as the mother on the birth certificate and Charles is identified as the father.  Pepper principally relies on the agreement titled RECIPIENT CONSENT FOR DONATION OF OOCYTES BY ANONYMOUS DONOR,

which described the relationships and the responsibilities of the parties. In pertinent part, the agreement reads, "[R]egardless of the outcome, I [Pepper] will be the mother of any child(ren) born to me as a result of egg donation and hereby accept all the legal responsibilities required of such a parent."

Recent developments in artificial reproduction technology have provided new and unique reproduction opportunities to infertile couples and those wishing to become single parents. These medical developments and opportunities have presented and will continue to present challenges to our courts which must now determine such fundamental questions as "who are the parents" amidst such a wide array of reproductive possibilities that now exist. As stated by Ardis L. Campbell, J.D., in his article *Determination of Status as Legal or Natural Parents in Contested Surrogacy Births*, 77 A.L.R. 5th 567 (2000) such opportunities and reproductive technologies will give rise to numerous issues:

> With the technological development of a number of processes of procreation, most notably in vitro fertilization, the conceptive and gestational phases of reproduction can now be separate. Thus, the genetic and gestational mothers of a child are no longer necessarily the same person, which can result in a child having several possible parents.
>
> These new reproductive technologies and arrangements give rise to the fundamental question of who should be recognized as the parents of a child born as a result of various parties making distinct contributions to the process of procreation. The question brings into focus issues of constitutional protections, public policy concerns, and the best interests of children.

*Id.* at 574.

Courts in some jurisdictions have looked to the parties' intent, as expressed in the surrogacy contract or arrangement, in situations where parentage cannot be clearly established under statutory or constitutional principles. An example of such a situation would be when the woman giving birth and the woman providing her gametic material are not the same person. *Id*. at 577-578. Courts relying on the intent approach have held that "parties who intended to procreate the child--to bring about the birth of a child that they intended to raise as their own--are deemed the natural and legal parents of the child." *Id.* at 578. See also *Johnson v. Calvert*, 851 P.2d 776, 782 (Cal. 1993); *In re Marriage of Buzzanca*, 61 Cal. App. 4th 1410, 1412-1413 (4th Dist. 1998); and *McDonald v. McDonald*, 608 N.Y.S. 2d 477 (N.Y. App. Div. 1994)(which relied on the reasoning in *Johnson v. Calvert*).

The "intent test" appears to have originated in the California Supreme Court case of *Johnson v. Calvert,* 851 P. 2d 776 (Cal. 1993). The court had to determine who was the child's "natural mother" when an embryo formed from the sperm and egg of a husband and wife were implanted in the uterus of another woman who, pursuant to a surrogacy agreement, carried the fetus to term and

gave birth. The contract the surrogate entered into with the husband and wife provided that the embryo created by the husband's sperm and wife's egg would be implanted in the surrogate, that the surrogate relinquished "all parental rights" and the husband and wife would be the parents. A dispute arose during the pregnancy prompting both sides to file suits. After determining that the Uniform Parentage Act did not provide a solution, the *Johnson* court considered the intent of the parties.

> Because two women each have presented acceptable proof of maternity, we do not believe this case can be decided without inquiring into the parties' intentions as manifested in the surrogacy agreement. Mark and Crispina are a couple who desired to have a child of their own genetic stock but are physically unable to do so without the help of reproductive technology. They affirmatively intended the birth of the child, and took the steps necessary to effect in vitro fertilization. But for their acted-on intention, the child would not exist. Anna agreed to facilitate the procreation of Mark's and Crispina's child. The parties' aim was to bring Mark's and Crispina's child into the world, not for Mark and Crispina to donate a zygote [embryo] to Anna. Crispina from the outset intended to be the child's mother. Although the gestative function Anna performed was necessary to bring about the child's birth, it is safe to say that Anna would not have been given the opportunity to gestate or deliver the child had she, prior to implantation of the zygote, manifested her own intent to be the child's mother. No reason appears why Anna's later change of heart should vitiate the determination that Crispina is the child's natural mother.

> We conclude that although the Act recognizes both genetic consanguinity and giving birth as means of establishing a mother and child relationship, when the two means do not coincide in one woman, she who intended to procreate the child--that is, she who intended to bring about the birth of a child that she intended to raise as her own--is the natural mother under California law. (footnote omitted).

*Johnson*, 851 P.2d at 782.

California again looked to the intent of the parties to resolve the question of who are the lawful parents in *In re Marriage of Buzzanca*, 61 Cal. App. 4th 1410 (4th Dist. 1998). *Buzzanca* involved a surrogacy situation where a husband and wife agreed for an embryo that was genetically unrelated to them to be implanted in a surrogate. The trial court accepted the parties' stipulation that the surrogate and her husband were not the lawful parents because they had entered into contracts agreeing that they were not the "biological" parents. The trial court went on to hold that the husband and wife who procured the implantation of the embryo were not the parents either because neither contributed the egg or sperm and the wife did not give birth. Based upon these holdings, the trial court ultimately found that the child had no parents. Reversing the trial court, the appellate court considered the fact that the husband and wife are the ones who initiated the chain of events that culminated in the birth of the child stating, "Let us get right to the point: Jaycee [the child] never would have been born had not Luanne and John [wife and husband] both agreed to have a fertilized

-6-

egg implanted in a surrogate." *Id*. at 1412. The court recognized that fatherhood can be established by conduct even though there is no genetic connection. The court cited the example whereby a man is recognized as the father of a child when he allows his wife to be artificially inseminated. Going further, the court extended this reasoning to a man and woman who procure a surrogate to bear a child who is not related to them, thus recognizing both of the procurers as the parents. Such a result is warranted because, "In each instance, a child is procreated because a medical procedure was initiated and consented to by intended parents." *Id.* at 1413. The court explained its rationale as to why it was error for the trial court to adopt a position that would have the effect of making a child parentless who was conceived and born as the result of an *in vitro* fertilization procedure:

> The legal paradigm adopted by the trial court, and now urged upon us by John, is one where all forms of artificial reproduction in which intended parents have no biological relationship with the child result in legal parentlessness [sic]. It means that, absent adoption, such children will be dependents of the state. One might describe this paradigm as the "adoption default" model: The idea is that by not specifically addressing some permutation of artificial reproduction, the Legislature has, in effect, set the default switch on adoption. The underlying theory seems to be that when intended parents resort to artificial reproduction without biological tie the Legislature wanted them to be *screened* first through the adoption system. (Thus John, in his brief, argues that a surrogacy contract must be "subject to state oversight.")

> The "adoption default" model is, however, inconsistent with both statutory law and the Supreme Court's *Johnson* decision. As to the statutory law, the Legislature has already made it perfectly clear that public policy (and, we might add, common sense) favors, whenever possible, the establishment of legal parenthood with the concomitant responsibility. Family Code section 7570, subdivision (a) states that "There is a compelling state interest in establishing paternity for all children." The statute then goes on to elaborate why establishing paternity is a good thing: It means someone besides the taxpayers will be responsible for the child: "Establishing paternity is the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits ...." (*Ibid.*) In light of this strong public policy, the statutes which follow section 7570, subdivision (a) seek to provide a "simple system allowing for the establishment of voluntary paternity." (Fam. Code, § 7570, subd. (b).)

> Family Code Section 7570 necessarily expresses a legislative policy applicable to maternity as well. It would be lunatic for the Legislature to declare that establishing paternity is a compelling state interest yet conclude that establishing maternity is not. The obvious reason the Legislature did not include an explicit parallel statement on "maternity" is that the issue almost never arises except for extraordinary cases involving artificial reproduction.

*In re Marriage of Buzzanca* at 1423.

On facts that are similar to the instant case, the New York court in *McDonald v. McDonald*, 608 N.Y.S. 2d 477 (N.Y. App. Div. 1994) looked to the intent of the parties test set out in California's *Johnson v. Calvert.* The wife in *McDonald,* who was unable to conceive naturally, went through an *in vitro* fertilization process in which her husband's sperm was used to fertilize a donor's egg and the fertilized eggs were then implanted in the wife resulting in the birth of twins. In his action for divorce, the husband sought custody and argued that his claim was superior to his wife's because she was not the genetic mother of the children. This, he argued, was due to the fact that a donor's eggs, not hers, were used to conceive. Finding the "intent test" persuasive--as well as the *Johnson* analogy to an "egg donation" situation[3]–the court found that the wife, who was the gestational surrogate, was the mother. *McDonald* at 480.

Before the California Supreme Court's decision in *Johnson v. Calvert*, our supreme court faced issues concerning the disposition of frozen embryos in *Davis v. Davis,* 842 S.W.2d 588 (Tenn. 1992). While *Davis* presented different issues than the instant case it gives guidance, particularly with respect to the importance of the understanding between the parties. In *Davis*, after the couple divorced, the former wife attempted to donate the embryos to another couple for implantation. The former husband objected and requested that the embryos be destroyed. The court noted the absence of a written agreement providing for the disposition of unused embryos and suggested that an agreement could have influenced or controlled the result of the litigation. *Id.* at 590. Though arguably *dicta*, the court elected to provide guidance concerning *in vitro* fertilization procedures and discussed the validity and enforceability of prior contracts governing the disposition of unused embryos.

> Despite our reluctance to treat a question not strictly necessary to the result in the case, we conclude that discussion is warranted in order to provide the necessary guidance to all those involved with IVF [*in vitro* fertilization] procedures in Tennessee in the future--the health care professionals who administer IVF programs and the scientists who engage in infertility research, as well as prospective parents seeking to achieve pregnancy by means of IVF, their physicians, and their counselors.
>
> We believe, as a starting point, that an agreement regarding disposition of any untransferred preembryos in the event of contingencies (such as the death of one or more of the parties, divorce, financial reversals, or abandonment of the program) should be presumed valid and should be enforced as between the progenitors. This conclusion is in keeping with the proposition that the progenitors, having provided the gametic material giving rise to the preembryos, retain decision-making authority as to their disposition. (footnote omitted).

---

[3]This analysis in *Johnson* appears to be *dicta*.

-8-

At the same time, we recognize that life is not static, and that human emotions run particularly high when a married couple is attempting to overcome infertility problems. It follows that the parties' initial "informed consent" to IVF procedures will often not be truly informed because of the near impossibility of anticipating, emotionally and psychologically, all the turns that events may take as the IVF process unfolds. Providing that the initial agreements may later be modified *by agreement* will, we think, protect the parties against some of the risks they face in this regard. But, in the absence of such agreed modification, we conclude that their prior agreements should be considered binding. (emphasis in original).

*Davis,* 842 S.W.2d at 597.

We see *Davis* as underscoring the importance of an agreement between the parties for, in the current environment, new reproductive technologies can make traditional methods of determining parentage ineffectual. Therefore, we find *Davis* instructive but not controlling.

*In re Thompson*, 11 S.W.3d 913 (Tenn. Ct. App. 1999) was a consolidated appeal stemming from two separate cases where the biological mother in each case was involved in a same-sex relationship with a non-parent and sought custody and/or visitation rights. In one of the consolidated cases, *White v. Thompson*, the litigants were Pam White and Patricia Thompson, the latter being the biological mother who gave birth following artificial insemination. Ms. White, who was not a parent but was involved in a relationship with Thompson, asserted that she provided care and support to Thompson before and after the pregnancy and to the child even after the relationship between the couple ended. In the other consolidated action, *Coke (and Dooley) v. Looper*, Ms. Coke was the biological mother and Mr. Dooley was the biological father. Ms. Looper admitted that Ms. Coke and Mr. Dooley were the natural parents of the child and that the child had been legitimated; however, she argued that the child was conceived by artificial insemination after two years of joint efforts by the two women, Ms. Coke and Ms. Looper, to produce a child that they could raise together.

A significant distinction between the *Thompson* cases and the instant case is that neither Ms. White nor Ms. Looper were the gestational surrogate. Moreover, Ms. White and Ms. Looper only sought visitation rights, not a declaration of parentage. Further, in *Coke (and Dooley) v. Looper*, Ms. Looper acknowledged that Ms. Coke and Mr. Dooley were the parents and there was a "co-parenting" agreement between Ms. Coke and Ms. Looper which provided that Ms. Looper would have no financial obligations to the child if Coke and Looper were no longer living together. Additionally, there was no contractual provision in either case denoting the party seeking visitation as the parent of the child.

The *Thompson* opinion is important for that court found that our legislature had not conferred a right of visitation upon "a nonparent who is not and has not been married to either of the children's parents, but who previously maintained an intimate relationship with such a parent and who previously provided care and support to the children." *Id.* at 923. While we find *Thompson* persuasive, it is not controlling because of two important differences in the facts. First, here there

-9-

are only two people, not three or more, who are seeking rights to the children.  Second, Charles entered into a series of agreements with Pepper at the fertility clinic and in all of these agreements Charles acknowledged that Pepper would be the mother of the children.  These differences are further enhanced because no other woman has made a claim or can make a claim adverse to Pepper's claim that she is the mother of the children because the only other person who could have made a claim, the anonymous egg donor, waived her parental rights.

In *Johnson v. Calvert* the "intent test" was used to break the tie between the surrogate and the "intended" mother.  Here, there is no tie to break.  Moreover, a finding based simply on genetics will result in the three children having no mother.  We find no authority in this or any state that favors the result of the children having no mother.  In *Buzzanca* the California court found that the legislature had expressed a legislative policy that would be equally applicable to maternity.  "It would be lunatic for the Legislature to declare that establishing paternity is a compelling state interest yet conclude that establishing maternity is not. The obvious reason the Legislature did not include an explicit parallel statement on 'maternity' is that the issue almost never arises except for extraordinary cases involving artificial reproduction."  *In re Marriage of Buzzanca,* at 1423.  Such a holding is equally applicable in Tennessee for public policy and common sense favor whenever permissible the establishment of paternity and maternity.

Based upon the foregoing review, we find that the adoption and paternity statutes of Tennessee do not control and are of little persuasive authority in determining whether Pepper is or is not the children's mother.  The Tennessee paternity statute, Tenn. Code Ann. § 36-2-302, does not control for the anonymous  woman who donated the eggs to conceive the children waived all of her parental rights by contract pursuant to the *in vitro* fertilization protocol.  The adoption statute, Tenn. Code Ann.§ 36-1-101 through 36-1-305, does not control for no one is attempting to adopt the children.  Moreover, the statutory provisions pertaining to "surrogate birth" stated in Tenn. Code Ann. § 36-1-102(48)(A) are not applicable to this case because the statutory meaning of "surrogate birth" is expressly based on the predicate that the surrogate entered into a contract by which she relinquished all parental rights to the children.  Such is not the case here for, to the contrary, the contracts Charles and Pepper entered into expressly provided that Pepper was the mother.

Considering all of the above, we find *Johnson v. Calvert* and *McDonald v. McDonald* to be the more persuasive authorities.  Therefore, we hold that this issue should be resolved by looking to the intent of the parties.

In situations such as this, when no one else has or can make a claim to be the mother of the children, the agreement between the parties takes on an important role in determining whether the gestational surrogate is the mother.  The agreements signed by Charles and Pepper with the fertility center have not been challenged. THE RECIPIENT CONSENT FOR DONATION OF OOCYTES BY ANONYMOUS  DONOR which described the procedure, its risks, relationships between the parties, and the responsibilities of the parties was accompanied by the acknowledgment of a physician that the treatment was "defined and fully explained."  That agreement, signed by Charles, stated in pertinent part:

I, [Pepper] (wife), understand that the child(ren) conceived by this method will not have my genetic material, but will have that of the oocyte donor and my husband. However, regardless of the outcome, *I will be the mother of any child(ren) born to me as a result of egg donation and hereby accept all the legal responsibilities required of such a parent.* (emphasis added)

Accordingly, Charles expressly stated his intent when he agreed that Pepper would be the children's mother. Based on this intent, and realizing that no other person is making a claim that she is the mother of the children, we find that Pepper is the mother of C.K.G., C.A.G., and C.L.G. and affirm the trial court.

## Estoppel

Next, Pepper argues that Charles is estopped to deny that she is the mother of the children. Estoppel is rooted in fairness, good faith, public policy and justice and its purpose is to "forbid one to speak against his own act, representations, or commitments to the injury of another who reasonably relied thereon and such an estoppel cannot arise against the party except when justice to the rights of others demands it." *Seagram Distillers Company v. Jones*, 548 S.W.2d 667, 672 (Tenn. Ct. App. 1976). The doctrine is equitable in nature and:

> [p]revents a party from raising a claim or taking a legal position when his conduct with regard to that claim is contrary to his position. Estoppel requires (1) words, acts, conduct, or acquiescence causing another to believe in the existence of a certain state of things; (2) wilfulness or negligence with regard to the acts, conduct, or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated. (citations omitted).

*In re Robby's Pancake House of Florida, Inc.* 21 B.R. 754, 758-759 (Bkrtcy.Tenn., 1982).

Estoppel is applied by the courts to prevent an unconscionable and inequitable result. The doctrine is "extended as to embrace all cases where in equity and good conscience the party against whom it is urged ought not to be permitted to gainsay to another's prejudice that which he, by word or conduct, induced his adversary to believe to be the truth." 11 *Tenn. Jurisprudence*, Estoppel § 24 (1995) (citing *Walker v. Walker*, 3 Tenn. Civ. App. (Higgins) 670 (1913)). While courts guard use of the doctrine strictly because estopping a party may also exclude the truth, a party may be "deprived of setting up the truth" if it directly contradicts previous conduct and another party has been induced to rely on the conduct to its detriment. *Rogers v. Colville*, 238 S.W. 80, 83 (1922).

Under the first estoppel factor, the record is compelling that Charles, through his conduct, caused Pepper to "believe in the existence of a certain state of things" principally that she would be the children's mother. He signed agreements with Pepper at the fertility center which acknowledged that Pepper would be the children's mother. He looked for a home for the family, made the

$180,000 down payment necessary to purchase the house, and the property was deeded to Charles and Pepper as tenants in common. He lived with Pepper and shared care of the children.

Under the second factor, wilfulness or negligence conduct, we find that Charles willfully entered into a course of conduct and into a series of agreements by which he expressly induced Pepper into believing that she would be the mother of the children. Moreover, after the birth of the children, Pepper was designated the mother of the children on the birth certificate and Charles took no action to challenge that designation on the birth certificate until this lawsuit arose some fourteen months later. We therefore find that this factor weighs substantially in favor of Pepper.

As for the third factor, detrimental reliance by Pepper, we also find in favor of Pepper for the evidence is compelling that she would not have allowed herself to be artificially impregnated had it not been for Charles' representations and actions that she would be the mother of the children.

Accordingly, we find that Charles is estopped from challenging Pepper's claim that she is the mother of the children.

## Comparative Fitness

Charles asserts that the court erred in applying the comparative fitness standard to determine custody of the children. Pepper counters, arguing that since she was found to be a legal parent, the proper standard in determining custody was employed by the trial judge.

While Charles asserts that the court erred in applying the comparative fitness standard, his principal argument challenging custody is that he is the father and Pepper is not the mother; therefore, the court had no option but to award custody of the children to him in the absence of proof of substantial harm to the children. This burden, he asserts, would have to be carried by Pepper because he, as the only parent, has a constitutionally protected right to raise his children. A determination of custody under such a standard would require that Pepper prove that Charles is an unfit parent. Since we have held that Pepper is the mother of the children, this argument is moot.

## Tender Years Doctrine

Charles's third issue is that the trial court erroneously applied the "Tender Years Doctrine" in making its custody determinations. Charles alleges that this standard, which has been revoked, was relied on by the trial court and used to "tip" the scales in favor of Pepper. Charles alleges that this may be inferred because he and Pepper were substantially equal under the comparative fitness analysis and the trial judge made reference to the Tender Years Doctrine in his remarks prior to awarding primary custody to Pepper.

Charles asserts that he demonstrated that he can properly care for the children and that the record shows that he bonded with the children, cared for their day to day needs, modified his work schedule so that he can be available for them, and hired a nanny to assist in their care. Pepper

counters arguing that while the trial court made a passing reference to the Tender Years Doctrine, the trial judge acknowledged that Tennessee no longer employs the doctrine and based his ruling on the totality of the circumstances.

The statement by the trial judge that Charles challenges is as follows:

> I know that we no longer have a tender years doctrine in Tennessee. And I know just mentioning that is certainly going to raise Mr. Schell's eyebrows, but the fact of the matter is we have three, not one, not two--but three two year old children. And I believe based on what I have heard, the totality of the circumstances, that the Mother is in a better position to take care of these small children, and call the shots on a day in, day out basis than the Father is.

While the trial judge mentioned the Tender Years Doctrine, he nevertheless expressly stated that the doctrine was no longer applicable and thus disavowed the doctrine before announcing his custody decision. Further, we do not infer from his comments that he applied the doctrine and, to the contrary, we find that he based his ruling on the totality of the circumstances.

In determining custody, the "child's best interest is the paramount consideration." *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983). "It is the polestar, the *alpha and omega*." (emphasis in original) *Id.* at 665. Factors to be considered in awarding custody include:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary care giver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . . ;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

. . . .

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106.

"The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Lee v. Lee*, 66 S.W.3d 837, 851 (Tenn. Ct. App. 2001). Moreover, since this court has not personally observed the attitude and demeanor of the parties or been able to make a determination of credibility based on personal observation, the trial court's judgment as to credibility and suitability of a custodian must be given great weight absent some compelling reason otherwise. *Bush v. Bush*, 684 S.W.2d 89, 94-95 (Tenn. Ct. App. 1984). While the evidence was controverted as to the qualifications of the parents to have primary custody, there was more than ample evidence before the trial judge to sustain his ruling that Pepper should have primary custody under these factors. Therefore, we find that the trial judge's ruling that Pepper should have primary custody should not be disturbed.

Accordingly, the decisions of the trial court are affirmed in all respects and this case is remanded to the trial court for such proceedings as may be necessary. Costs of appeal are assessed against Appellant, Charles.

_____
FRANK G. CLEMENT, JR., JUDGE